WASHAKIE COUNTY SCHOOL DISTRICT NUMBER ONE, Donna Moberly, Mary Jane Schmeltzer, Randall Rideout, Harold McDonald, Harry Ujifusa, Robert Moody and James Argeris, being all of the members of The Board of Trustees of Washakie County School District Number One; Mary Jane Schmeltzer as next friend for Christopher Schmeltzer, Joe Schmeltzer, and Frances Schmelzter, minors; Randall Rideout as next friend for Jason Rideout, Anthony Rideout, and Michael Rideout, minors; Harold McDonald as next friend for Keven McDonald, Keith McDonald, David McDonald, Kenneth McDonald, and Brian McDonald, minors; Harry Ujifusa as next friend for Kelly Ujifusa and Gayle Ujifusa, minors; Robert Moody as next friend for Todd Moody, Sherri Moody, Cindy Moody, John Moody, Al Moody, and Scott Moody, minors; and James Argeris as next friend for Jayme Argeris, Tawn Argeris, and Brett Argeris, minors; Uinta County School District Number Six, G. Grant Redden, Clint Walker, F. Danny Eyre, Donald R. Carroll and Curtis Morgan, being all of the members of The Board of Trustees of Uinta County School District Number Six,* Fremont County School District Number 25, Dennis Tippets, L. J. Geraud, Patricia B. Ferris, Alice Kucera, Stanley Smalley, and Thomas Youtz, being all of the members of The Board of Trustees of Fremont County School District Number Twenty Five, and Albert B. Schultz, Appellants (Plaintiffs),

v.

Ed HERSCHLER, Governor, State of Wyoming, Lynn Simons, State Superintendent of Public Instruction, Shirley Wittler, Wyoming State Treasurer, John Patton, Keith West, Dr. Denis Lyman, Bar-

---

* Uinta County School District Number Six, G. Grant Redden, Clint Walker, F. Danny Eyre, Donald R. Carroll and Curtis Morgan, being all of the members of the Board of Trustees of Uinta County School District Number Six did not participate in this appeal.

bara Rogers, Keith Becker, Redell Hooper, Karen Hand, Dr. Donald Blakeslee, Glenn Engleking, being all of the members of the Wyoming State Board of Education, Park County School District Number Sixteen, Campbell County School District Number One, Converse County School District Number One, Hot Springs County School District Number One, Carbon County School District Number Two, Sublette County School District Number Nine, Sweetwater County School District Number One, and Lincoln County School District Number One, Appellees (Defendants).

No. 5145.

Supreme Court of Wyoming.

Jan. 15, 1980.

Rehearing Denied Feb. 7, 1980.

John W. Davis and Jeffrey A. Donnell, Worland, signed the brief; and Mr. Davis appeared in oral argument on behalf of the appellants.

John D. Troughton, Atty. Gen., Mary B. Guthrie, Asst. Atty. Gen., Lawrence J. Wolfe, Legal Intern, T. Michael Golden, Rawlins, for Carbon County School Dist. No. 2; Ross D. Copenhaver, Powell, for Hot Springs County School Dist. No. 1 and Sublette County School Dist. No. 9; Dennis L. Sanderson, Kemmerer, for Lincoln County School Dist. No. 1; Ford Bussart, Rock Springs, for Sweetwater County School Dist. No. 1; J. Patrick Hand, Douglas, for Converse County School Dist. No. 1; L. B.

Cozzens, Cody, for Park County School Dist. No. 16; and Wade Brorby, Gillette, for Campbell County School Dist. No. 1, signed the brief for appellees. Wolfe, Legal Intern, & T. Michael Golden, Rawlins, appeared in oral argument on behalf of appellees.

Before RAPER, C. J., McCLINTOCK, THOMAS, and ROSE, JJ., and HILL, D. J.**

RAPER, Chief Justice.

■ On June 20, 1978, the appellants brought action under the Wyoming Uniform Declaratory Judgments Act [1] seeking relief from the Wyoming system of financing public education. The appellants described in their complaint the inequities that are resulting from the financing system currently used in this state and asked as relief that the system be declared violative of the Wyoming Constitution. In the latter part of August, 1978, numerous motions to dismiss [2] were filed by the defendants. Memoranda of law were submitted by all parties on the various issues raised in the motions to dismiss. After some intermediate proceedings, the district court entered its order dismissing the complaint on May 4, 1979. The order dismissing the complaint stated *no ground upon which it was based.* However, a letter from the district court to the parties under date of April 10, 1979, sheds some light on the action:

"I have considered the various memorandums of all counsel previously submitted with regard to the above captioned case and specifically with regard to my prior request that there be considered the possibility of stipulations which would permit the submission of this case to the Wyoming Supreme Court on reserved constitutional questions.

"Counsel have obviously taken the position that they do not desire to cooperate

** Justice Rooney having recused himself, District Judge Robert A. Hill, Second Judicial District, was assigned.

2. The defendants' time in which to answer was enlarged by the court under a stipulation entered into by the parties.

1. §§ 1–37–101 to 1–37–115, W.S.1977.

in such an endeavor and since the Court has no ability to require them to do so I can only conclude that we cannot proceed in that manner at this time. I felt that it was important to the citizens of this state and the various school districts that this case be resolved by a final decision of the Supreme Court in the earliest and most economical manner but that obviously is not going to happen.

"Consequently, as I indicated at the oral hearing in Thermopolis, the Court will grant the motions to dismiss. Defendant's counsel are directed to prepare appropriate orders and to submit the same to all counsel for approval and then to the Court for signature and entry.

"I presume that following that, this case could languish on for several appeals and many years before we get any final determination on the merits, for which I am genuinely regretful."

The district court's action in dismissing appears to be antithetical to his expressed hope for an early and economical decision of the case and the avoidance of multiple appeals. As will become evident as this opinion progresses, the district court's action will in fact not serve to delay a substantive decision of this crucial question. We will hold the Wyoming system of school financing unconstitutional in that it fails to afford equal protection in violation of the Wyoming Constitution.

The motions to dismiss were based on several grounds. Essentially they were these:

(1) Appellants' complaint does not state a claim on which relief can be granted.

(2) The appellants' complaint lacks specificity, i. e., it does not specifically identify the statute or statutes which they allege to be in contravention of the constitution but rather merely assert that the "system of financing public education" is in violation of the constitution.

(3) The appellants each lack standing to bring the complaint.

(4) The appellants' action is not a justiciable controversy: The questions presented are political in nature and must be addressed by the legislature rather than the courts.

(5) The appellants' action is defective because they failed to join every taxpayer as a party.

(6) The appellants' action should be dismissed for failure to request a proper remedy.

Since the appellees asserted these numerous grounds as bases for dismissal in the district court and since the district court did not specify on which ground or grounds he based his grant of dismissal, we will address each of these issues serially, giving to each a brief but clearly defined answer, before proceeding to the principal question raised by this appeal—i. e., is the Wyoming system of financing public education in violation of the Wyoming Constitution? As the momentum of the opinion accelerates, these preliminary questions will fade from sight as superficial.

■ Appellees assert that the appellants' complaint does not state a claim on which relief can be granted. The appellants are claiming that under the Wyoming Constitution they have a right to a school financing system that provides a relatively uniform amount of money on an annual per-pupil basis to each of the Wyoming school districts,[3] i. e., they are entitled to an equal educational opportunity. Further, they claim that under the financing system which has been established by the legislature they are denied such an equal educational opportunity. Wyoming has adopted the Uniform Declaratory Judgments Act, supra. It is evident from a reading of that

3. We are well aware that the formula that will provide equality will be quite complex. More money may be needed in one school district to achieve quality education than in another because of, e. g., transportation costs, building maintenance costs, construction costs, logistic considerations, number of pupils with special problems, et cetera. However, it is not a problem that cannot be solved, challenging though it might be.

Act and the case law interpreting it that the instant action was properly brought under the auspices of that legislation. The appellants seek a determination of their rights and status under the constitution and statutes of this state.[4] We will not deny the direction of the Act that it be liberally construed and administered, particularly when there is a question of great public importance as is the one before us. *Brimmer v. Thomson*, Wyo. 1974, 521 P.2d 574. Those statutes empower the courts to grant relief of a declaratory nature. We can only conclude that the appellants' complaint states a claim on which relief can be granted.

Appellees assert that the complaint lacks specificity in that it fails to enumerate the statutes which it claims to be in violation of the Wyoming Constitution in that appellants contented themselves with stating merely that the "system" of financing public education is in violation of the constitution. Although it certainly may have been better had the appellants been more detailed in their allegations, we cannot conclude that the complaint was so deficient as to require dismissal, particularly since we do not intend to be as specific in our disposition as appellees might wish. Whether the specificity standard has been satisfied is to be determined in terms of whether the pleadings give fair notice to the opposing party. *Harris v. Grizzle*, Wyo. 1979, 599 P.2d 580. We cannot ignore that appellees demonstrated from the very beginning their complete understanding of the statutes that appellants complained of

and how those statutes contributed to the ailments described in the complaint. We can only conclude that the appellants' use of the language "system" of financing public education, under the special and unique circumstances of this case, was as plain and clear a reference to statutes as if they had cited them by chapter and section numbers. We have no problem locating the pertinent constitutional provisions and related statutory sections; they are easily identifiable. To urge us to decide otherwise would be to ask us to stick our heads in the sand.

Appellees have asserted that each of the named appellants lack standing to sue under the circumstances presented by this case. As defined in Black's Law Dictionary, pp. 1260–1261, 5th ed. (1979):

"*Standing to sue doctrine.* 'Standing to sue' means that party has sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636. Standing is a concept utilized to determine if a party is sufficiently affected so as to insure that a justiciable controversy is presented to the court. The requirement of 'standing' is satisfied if it can be said that the plaintiff has a legally protectible and tangible interest at stake in the litigation. *Guidry v. Roberts*, La. App., 331 So.2d 44, 50. Standing is a jurisdictional issue which concerns power of federal courts to hear and decide cases and does not concern ultimate merits of substantive claims involved in the action.

---

4. The most significant provisions are:

§ 1–37–102, W.S.1977:

"Courts of record within their respective jurisdictions may declare rights, status and other legal relations whether or not further relief is or could be claimed. No proceeding is open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect, and such declarations shall have the effect of a final judgment."

§ 1–37–103, W.S.1977:

"Any person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or

other legal relations are affected by the Wyoming constitution or by a statute, municipal ordinance, contract or franchise, may have any question of construction or validity arising under the instrument determined and obtain a declaration of rights, status or other legal relations."

§ 1–37–107, W.S.1977:

"The enumeration in W.S. 1–37–103 through 1–37–106 does not limit or restrict the exercise of the general powers conferred in W.S. 1–37–102 in any proceeding where declaratory relief is sought, in which a judgment or decree will terminate the controversy or remove an uncertainty."

*Weiner v. Bank of King of Prussia*, D.C. Pa., 358 F.Supp. 684, 695.

"Standing is a requirement that the plaintiffs have been injured or been threatened with injury by governmental action complained of, and focuses on the question of whether the litigant is the proper party to fight the lawsuit, not whether the issue itself is justiciable. *Carolina Environmental Study Group, Inc. v. U. S. Atomic Energy Comm.*, D.C. N.C., 431 F.Supp. 203, 218. Essence of standing is that no person is entitled to assail the constitutionality of an ordinance or statute except as he himself is adversely affected by it. *Sandoval v. Ryan*, Colo.App., 535 P.2d 244, 247."

■ Standing is a concept used to determine whether a party is sufficiently affected to insure that a justiciable controversy is presented to the court. 67A C.J.S. Parties § 12, p. 662. It is a necessary and useful tool to be used by courts in ferreting out those cases which ask the courts to render advisory opinions or decide an artificial or academic controversy without there being a palpable injury to be remedied. However, it is not a rigid or dogmatic rule but one that must be applied with some view to realities as well as practicalities. Standing should not be construed narrowly or restrictively. *Wisconsin's Environmental Decade, Inc. v. Public Service Commission of Wisconsin*, 1975, 69 Wis.2d 1, 230 N.W.2d 243, 249. Further, as said in *Residents of Beverly Glen, Inc. v. City of Los Angeles*, 1973, 34 Cal.App.3d 117, 109 Cal.Rptr. 724, 727:

"In recent years there has been a marked accommodation of formerly strict procedural requirements of standing to sue [citation] and even of capacity to sue [citation] where matters relating to the 'social and economic realities of the present-day organization of society' [citation] are concerned. Accordingly, we have seen a retreat from * * * formalism and rigidity * * *."

■ The appellants in this suit are three school districts and the school board members of those districts,[5] the school board members as taxpayers and as parents of children attending the school districts and several students who attend schools in Washakie County School District Number One.

Educating the youth of our state is an important function performed by our state government. Our constitution, as we shall see, plainly expresses the commitment of a free people to the value of a thorough education. The school districts and the members of school boards are charged with the responsibility of providing education to the children of Wyoming and are tangibly injured if the statutes which guide their hands disenable them from so providing. Parents are keenly concerned and suffer tangible injury if their children do not receive a proper education. The children themselves are, obviously, tangibly injured if they do not uniformly receive the best education that tax resources can provide. With these considerations in mind, we hold that each of the named appellants has standing to sue under the circumstances of this case.

■ Appellees asserted that the question presented by the declaratory judgment action does not present a justiciable controversy and is essentially a political question that can and must be answered *only* by the legislature. We agree that the legislature *must* act; but, as shall be made clear as we proceed, it must enact tax legislation to support public schools consistent with the spirit and letter of the Wyoming Constitution. This question of justiciability is closely tied to those we have answered above. We concede that the issues raised in a declaratory judgment action must constitute a justiciable controversy. The criteria which qualify a justiciable controversy are set out in *Brimmer v. Thomson*, supra, 521 P.2d at 578, quoting from *Sorenson v. City of Bellingham*, 80 Wash.2d 547, 496 P.2d 512, 517:

"'* * * First, a justiciable controversy requires parties having existing and

5. One of these school districts and its board members, which was a plaintiff (appellant) below, did not join in this appeal, but that does not affect the issues. Their interests neither add to nor detract from the interests of appellants nor are they necessary to an adjudication.

genuine, as distinguished from theoretical, rights or interests. Second, the controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument evoking a purely political, administrative, philosophical or academic conclusion. Third, it must be a controversy the judicial determination of which will have the force and effect of a final judgment in law or decree in equity upon the rights, status or other legal relationships of one or more of the real parties in interest * * *. Finally, the proceedings must be genuinely adversary in character and not a mere disputation, but advanced with sufficient militancy to engender a thorough research and analysis of the major issues. * * * '"

We find each of these qualifications to be met in the instant case. Nonetheless, we point out that in declaratory judgment actions there is a well-recognized exception that the rule requiring the existence of justiciable controversies is somewhat relaxed in matters of great public interest or importance. *Brimmer, supra,* 521 P.2d at 578. We have already made clear our view and will amplify on it, that the matter of education involves a fundamental interest of great public importance. This is no more a political question than any other challenge to the constitutionality of statutes. Declaring the validity of statutes in relation to the constitution is a power vested in the courts as one of the checks and balances contemplated by the division of government into three departments—legislative, executive and judicial—ever since first enunciated in *Marbury v. Madison,* 1803, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 and carried forward into Wyoming state government by § 1, Art. II, Wyoming Constitution.

6. § 1–37–113, W.S.1977:

"When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding. In any proceeding which involves the validity of a municipal ordinance or franchise, the municipality shall be made a party and may be heard. If the statute, ordinance or franchise is alleged to be unconstitutional, the attorney general of the state

Appellees assert that all taxpayers in this state had to be served in order to comply with § 1–37–113, W.S.1977.[6] We do not agree. A summons and copy of the complaint were served upon the Attorney General of the State of Wyoming.[7] This was in compliance with the statute, § 1–37–113, W.S.1977. Also see, 12 Uniform Laws Annotated, Declaratory Judgments Act, § 11; and Annotations, 71 A.L.R.2d 723. There is no merit to the claim that appellants' complaint should have been dismissed for failure to name all taxpayers as defendants. Such a requirement would be a departure from reason.

Finally, the appellees assert that the motion to dismiss was properly granted because the appellants did not seek a proper remedy. The appellants asked as their remedy that the Wyoming system of public school financing be declared unconstitutional and that the courts retain jurisdiction over the controversy, staying the declaration and delaying further remedy until the Wyoming legislature shall next again meet. Appellants may not be entitled to the exact relief they requested, but their complaint was not subject to dismissal because of the prayer for relief. The appellees cited no authority nor have we uncovered any which would require the dismissal of appellants' complaint on this ground. Indeed, as shall be further developed in the course of this opinion, the demand for relief is quite similar to that granted by courts which have addressed the question of unconstitutional public school financing statutes, which we shall cite.

We hold that the claim of plaintiffs-appellants has been brought on solid jurisdictional and procedural ground and the controversy is ripe for decision.

shall be served with a copy of the proceeding and may be heard."

7. The appellees named in the complaint (appropriate substitutions have been made to account for changes to officeholder and committee membership) are the Governor of the State of Wyoming, Wyoming's Superintendent of Public Instruction and State Treasurer, all members of the Wyoming State Board of Education, and several school districts in which disproportionate tax base wealth exists.

Courts have a duty to uphold the constitutionality of statutes which the legislature has enacted if that is at all possible, and any doubt must be resolved in favor of constitutionality. *Witzenburger v. State,* Wyo.1978, 575 P.2d 1100, 1112; *Lund v. Schrader,* Wyo.1971, 492 P.2d 202, 206. Though the supreme court has the duty to give great deference to legislative pronouncements and to uphold constitutionality when possible, it is the court's equally imperative duty to declare a legislative enactment invalid if it transgresses the state constitution. *Witzenburger,* supra, 575 P.2d at 1114. In our consideration of this case, we have consistently kept these basic principles in mind to avoid a declaration of unconstitutionality—but doubt is not present.

This court has previously considered school financing in the State of Wyoming and at that time recognized that ad valorem taxes for school purposes were not equalized, as required by § 28, Art. I, Wyoming Constitution.[8] *Sweetwater County Planning Committee for Organization of School Districts v. Hinkle,* Wyo.1971, 491 P.2d 1234. That case will be referred to as *Hinkle* where hereafter mentioned in this opinion. The court there made certain suggestions to the legislature which were intended as a bare-bone proposal for legislation intended to divide equally amongst the school districts all funds derived from ad valorem tax levies, as contemplated by § 28, Art. I, Wyoming Constitution.[9] We affirm the proposition that, as nearly as practicable, funds derived from ad valorem tax levies must be equally divided amongst the school districts of the entire state. The court indicated that it had been considerably influenced by the landmark case of *Serrano v. Priest,* 1971, 5 Cal.3d 584, 96 Cal. Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187, a case which in general held that a system of public school financing which relies heavily on local property taxes and causes substantial disparities among individual school districts in amount of revenue available per pupil invidiously discriminates against the students of the poor persons and is invalid as a violation of the due process clause of the Fourteenth Amendment to the Constitution of the United States and the equivalent provision of the California Constitution. We see nothing in our study to indicate that, in this state, poor persons or the children of poor persons are affected any differently than the children of persons in more affluent circumstances. All children in some districts are deprived. This situation does not divest the above-cited case of its soundness or applicability to the situation we have in Wyoming.

Violation of the Fourteenth Amendment of the U.S. Constitution as a ground for invalidating state systems of school finance has lost any viability since the decision of the United States Supreme Court in *San Antonio Independent School District v. Rodriquez,* 1973, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16, which held that the Texas system had no federal constitutional flaws in that the right to education is not explicitly or implicitly guaranteed by the terms of the United States Constitution. We find no need to dwell on *Rodriquez* any further because the decision we reach will be based on the provisions of the Wyoming Constitution, which is the authority we are governed by in this case.

This court retained jurisdiction in the *Hinkle* case for a "final decision after the next regular session of the legislature and for whatever further orders or disposition may be necessary in the meantime." In February, 1972, the court relinquished jurisdiction to permit the parties to settle their differences. In closing the case, this court declared that while it could no longer ignore inequalities in the matter of taxation for school purposes, nothing could be done

---

8. Section 28, Art. I, Wyoming Constitution: " * * * All taxation shall be equal and uniform." Our decision in this case will not rest upon this constitutional provision, though it undoubtedly bears upon the total constitutional picture of taxation with respect to public schools.

9. The court excluded from consideration funds derived from the six-mill state levy; motor vehicle fees; fines and forfeitures; Forest Revenue; Land Income; Taylor Grazing and all state and federal funds not derived from ad valorem taxes levied at the county level.

until the legislature convened and thereafter some adversely affected taxpayer could maintain an action on the question of invidious discrimination if it still existed after the legislature had convened and adjourned. *Hinkle* supra, upon reopening, Wyo.1972, 493 P.2d at 1050. The filing of this lawsuit breathed new life into that controversy and the determination of this court to provide a suitable remedy to this problem.

In a later case, where a consideration of the financing of schools within a county was at issue, this court recognized the serious nature of the disparity in assessed valuation per pupil and referred to students as "victims" when located in school districts having a low valuation ratio as compared to school districts having a high valuation ratio. In that case, the forecast of *Hinkle* that the problem of unequal assessed valuation may necessarily become the subject of statewide action was reaffirmed and it was announced that this court cannot ignore that courts of other states have held students are denied equal protection[10] when the disparity of valuation becomes too great. *Johnson v. Schrader*, Wyo.1973, 507 P.2d 814.

Both *Hinkle* and *Johnson* involved a consideration of the Wyoming School District Organization Law of 1969, §§ 21–5–101, et seq., W.S.1977 (as amended) (§§ 105 through 150, ch. 111, Session Laws of Wyoming, 1969), which had as one of its purposes to "provide a wiser and more efficient use of public funds for education by making it possible to reduce the disparity in per pupil valuation among school districts." Disparity was thus obviously a problem which the legislature was aware of and with which it was attempting to grapple. In view of its stated goal, the difficulty with that legislation is that it was not far reaching enough because, even if successful, it could only effect a reduction in disparity between school districts within each county. In 1971, when *Hinkle* was first decided, the disparity between counties was apparent. See appendix to opinion, *Hinkle*, supra, 491

P.2d at 1240–1250. It was apparent in the *Johnson* case as well. It is still apparent and has steadily grown even more imbalanced. It is an intricate unsettled question of statewide proportions. The question of inequality in school financing has been smoldering too long. The continuing dispute must be settled.

What is Wyoming's constitutional design of educational responsibility? "The *legislature* shall provide for the establishment and maintenance of a complete and *uniform system* of public instruction, embracing free elementary schools of every needed kind and grade, * * * ." (Emphasis added.) Section 1, Art. VII, Wyoming Constitution. "The general supervision of the public schools shall be entrusted to the state superintendent of public instruction, whose powers and duties shall be prescribed by law." Section 14, Art. VII, Wyoming Constitution. These and other constitutional expressions should leave no doubt that the legislature has complete control of the state's school system in every respect, including division of the state into school districts and providing for their financing. The legislature's powers are subject only to restrictions on discrimination on account of sex, race or color, § 10, Art. VII; prescribing textbooks, § 11, Art. VII; and, sectarianism, § 12, Art. VII. The matter of providing a school system as a whole and financing it is a responsibility of the legislature.

Financing of schools is assured by a broad spectrum of resources. With statehood came a grant by Congress of sections sixteen and thirty-six of each township in the state or in-lieu lands. Those lands and other miscellaneous property acquired by the state are held in trust as a "general school fund" and the annual income arising from the property is devoted exclusively to the support of free schools "in every county" in the state. Sections 2–8, Art. VII, Wyoming Constitution.

Under constitutional taxing authority there are several provisions:

---

**10.** Equal protection is granted by § 34, Article I, Wyoming Constitution wherein it is provided "All laws of a general nature shall have a uniform operation." *Nehring v. Russell*, Wyo. 1978, 582 P.2d 67.

1. A state tax for the support of schools: six mills on the dollar of the assessed valuation of the property in the state may be levied each year. Section 15, Art. XV, Wyoming Constitution.

2. A mandatory county tax for the support of schools of twelve mills on the dollar must be levied each year on the assessed valuation of the property in each county. The proceeds are distributed among the school districts within the county as the legislature shall provide. Section 17, Art. XV, Wyoming Constitution.

3. A part of county revenue from an annual tax levy of not to exceed twelve mills on the dollar "for all purposes including general school tax, exclusive of state revenue." Section 5, Art. XV, Wyoming Constitution.

4. An apparent unlimited power whereby the legislature shall make such further provisions "by *taxation or otherwise*, as with the income arising from the general school fund [trust income] will create and maintain a thorough and efficient system of public schools, adequate to the proper instruction of all youth of the state, between the ages of six and twenty-one years, free of charge; * *." (Emphasis added.) Section 9, Art. VII, Wyoming Constitution.

Implementing the constitutional provisions are various statutes. The six mill state levy provided by § 15, Art. XV, Wyoming Constitution is covered by § 21–13–303, W.S.1977. The legislature provides a formula for levying less than a six mill state tax. The funds accrued are placed in a trust fund and cannot be transferred to any other fund or account. The money generated is transferred into the foundation program account, which we shall describe.

The twelve mill county tax for school support prescribed by § 17, Art. XV, Wyoming Constitution is regulated by § 21–13–201, W.S.1977. The county treasurer collects the tax and:

"(b) On or before September 1 of each year, the state department of education shall notify the treasurer of each county of the percentage proportion to be allocated from the countywide twelve (12) mill school levy to each school district in his respective county. The computation of the distribution of the countywide twelve (12) mill levy shall be made by the department of education on the basis of the number of classroom units for the previous year, as that number is computed in W.S. 21.1–231 [§ 21–13–308].[11] This number, for each district, is to be converted into a percentage of the total number of classroom units for all school districts within the county. The county treasurer shall distribute the revenue arising from the countywide twelve (12) mill levy among the school districts of the county according to the percentage computed above, and pursuant to W.S. 21.1–223 [§ 21–13–207]." (Footnote added.)

The share of the general county tax for all county purposes, as a general school tax, as provided by § 5, Art. XV, Wyoming Constitution, is limited by § 21–13–205, W.S.1977, to not exceed three mills on the dollar, sufficient to raise $300.00 for each teacher and an amount for each school bus driver computed according to the formula set out in § 21–13–202, W.S.1977.

In addition to the foregoing, and apparently justified under the general terms of § 9, Art. VII, Wyoming Constitution, § 21–13–101, W.S.1977, provides for a school district tax:

"(a) Except as otherwise provided by law, the maximum rate of school district tax that may be levied for all school purposes, exclusive of bond interest and redemption, for any school district in any school year on each dollar of assessed valuation within the school district is as follows:

"(i) In a unified school district, twenty-eight (28) mills for combined elementary and high school purposes, three (3) mills of which shall not be levied except with the approval of a majority of the voters voting on the proposition;

**11.** This statute is a part of the complex system of distribution of funds under the foundation program, which we shall discuss at various points in this opinion. The foundation program provides a significant balancing factor in school financing, but it can only go so far.

"(ii) Any elementary nonunified school district, sixteen and eight-tenths (16.8) mills for elementary school purposes, one and eight-tenths (1.8) of which shall not be levied except with the approval of a majority of the voters voting on the proposition, plus not to exceed an additional five (5) mills for tuition to be expended for high school students from the district." [12]

This will be referred to in this opinion as the "Special District Levy." There is no specific authority for this tax in the state constitution such as in the case of the state tax, the county tax for schools and the general county tax.

■ At this point, the Wyoming School Foundation Program [13] should be briefly discussed. Its intent is to guarantee a minimum education for every child by providing state financial assistance in inverse proportion to the tax paying ability of the local school district. In other words, where local resources are high in some cases, little or no foundation funds are paid by the State to the district. Schools that raise relatively large amounts of money through property taxation receive considerably less support, if any, from the Foundation Fund than those districts where a comparable levy raises a smaller amount of money. If a district's assessed valuation—its tax base—is relatively high, it is able to raise enough money to go beyond the foundation program, whereas another district with low assessed valuation cannot increase its revenues to such a level even by taking advantage of all available local taxes.

The money apportioned to the schools from the Foundation Fund has several sources. In the Foundation Fund are placed all state moneys for elementary and secondary education, § 21–13–306, W.S. 1977, except the Land Income Fund which, by § 21–13–301, W.S.1977, must be distributed among the counties according to the number of pupils in each, as determined by ·statutory direction.[14] See also, §§ 21–13–301 and 21–13–302, W.S.1977, as amended. The six mill state levy on property, including motor vehicle registrations, is a Foundation Fund primary source but, in addition, the legislature appropriates money from the State's general fund. In 1978, $26,750,000 was appropriated from the general fund, § 15, ch. 42, Session Laws of Wyoming, 1978, for the period July 1, 1978 and ending June 30, 1980.

The foundation program is intended to take into account not only a basic education but also to consider exceptional and handicapped children, vocational training, kindergarten, the problems of a one-teacher rural school, bus transportation, tuition paid by one district to another, other variables and supplemental aid for those districts with less than the minimum assessed valuation per classroom unit.[15]

■ The sources to pay the cost of education in Wyoming for 1977–1978 is illustrated and clarified by the following table and pie taken from the Statistical Report Series No. 3, Wyoming Public Schools Fund Accounting and Reporting, 1977–78, published by the Division of Planning, Evaluation and Information Services, State Department of Education, Page 1: [16]

---

12. All school districts have now been unified. As amended by § 1 ch. 119, Session Laws of Wyoming, 1979.

13. Sections 21–13–305 through 21–13–314, W.S.1977.

14. Section 8, Art. VII, Wyoming Constitution originally read the same as the statute cited. Section 8 was amended by resolution adopted by the 1978 legislature, ratified by vote of the people at the 1978 general election, and proclaimed in effect on November 25, 1978. It now provides "for the equitable allocation of such income among all school districts in the state." This income could now conceivably be included in the foundation program, but apparently the legislature meeting in 1979 did not take any action as a result of the amendment,

other than refer to Average Daily Membership rather than according to number of pupils. For all practical purposes, ADM and number of pupils are the same.

15. For an excellent description and detailed discussion of the foundation program, see, The Wyoming School Foundation Program, published by the State Department of Education, 1976, found in the Wyoming State Library.

16. This court may take judicial notice of the official reports of the State Department of Education, *Hinkle*, supra, 491 P.2d at 1237. This particular tabulation and illustration will be referred to as Table 1. The statistics we will use in this opinion cover the period in question and are on file in the Wyoming State Library. Complete 1979 statistics are not yet available.

TABLE NO. 1

STATE SUMMARY: GENERAL FUND REVENUES 1977-78

STATE 32.2% LOCAL 42.6% COUNTY 22.8% FEDERAL 2.4%

Foundation Fund · Land Income Fund · Real Property Taxes

| LOCAL SOURCES | |
|---|---|
| Special District Taxes | $ 66,938,044 |
| Motor Vehicle Tax | 4,665,048 |
| Car Company Tax | 75,648 |
| Delinquent Taxes | 207,189 |
| Parks & Recreation | 26,342 |
| Other Local | 40,613 |
| In-State Tuition | 300,624 |
| Out-State Tuition | 230,417 |
| Handicapped Students | 129,080 |
| Adult Education | 32,767 |
| Summer School | 34,475 |
| Cooperative Programs | 93,947 |
| Transportation Fees | 50,013 |
| Interest Income | 991,930 |
| Food Service | 903 |
| Admissions | 428,750 |
| Other Pupil Activity | 232,086 |
| Rentals | 361,617 |
| Contributions | 19,772 |
| Sale of Fixed Assets | 498,747 |
| Loss Compensations | 225,975 |
| Refunds, Prior Year | 196,277 |
| Fund Transfers | 74,098 |
| Miscellaneous | 801,879 |
| LOCAL TOTAL | $ 76,656,248 |

| COUNTY SOURCES | |
|---|---|
| 12 Mill County Tax | $ 33,624,737 |
| 12 Mill, Motor Vehicle | 2,287,067 |
| General County Tax | 2,248,999 |
| Gen. Co., Motor Vehicle | 204,130 |
| Delinquent Taxes | 61,569 |
| Fines and Forfeitures | 2,397,864 |
| 12 Mill Car Co. Tax | 32,822 |
| Forest Reserve | 132,202 |
| Other County | 89,571 |
| COUNTY TOTAL | $ 41,078,962 |

| STATE SOURCES | |
|---|---|
| Foundation Program | $ 45,178,665 |
| Land Income Fund | 12,277,350 |
| Taylor Grazing | 385,095 |
| Other State | 86,583 |
| STATE TOTAL | $ 57,927,687 |

| FEDERAL SOURCES | |
|---|---|
| P. L. 874 | $ 4,209,911 |
| Other | 197,610 |
| FEDERAL TOTAL | $ 4,407,521 |

Total General Fund Revenues: $180,070,409

324

In this opinion we will consider for the most part the property tax sources of income for schools. There are other sources of income for the various school districts such as fines and forfeitures paid to the county treasurers pursuant to § 5, Art. VII, Wyoming Constitution;[17] gifts, § 3, Art. VII, Wyoming Constitution, and § 21–13–403, W.S.1977; federal aid and grants, §§ 21–13–401 through 21–13–403; and miscellaneous receipts as shown by the foregoing Table No. 1. The principal source of local school support comes from property taxes raised by mill (1/1,000th of one dollar or ¹⁄₁₀th of a cent) levy on each dollar of assessed valuation. It is this latter source, wherein originates the disparity and constitutional fault. Were all counties and school districts blessed with equal assessed property valuations within their boundaries with each having the same student population, there would be no problem; but it is common knowledge that such a phenomenon is not possible and statistical information bears that out. Even superficial reflection upon the system outlined above reveals that it will inherently create disparity. Nonetheless, that disparity must be demonstrated.

There were fifty school districts in the State of Wyoming at the time this litigation was initiated. From the Statistical Report Series, No. 1, 1978 School District Property Valuations, Mill Levies and Bonded Debt, a report prepared by the Division of Planning, Evaluation and Information Services, State Department of Education, pages 6, 7 and 8 shows the wide range of assessed valuation per student and the various levies in all districts:[18]

17. Section 5, Art. VII, Wyoming Constitution: "All fines and penalties under general laws of the state shall belong to the public school fund of the respective counties and be paid over to the custodians of such funds for the current support of the public schools therein."

18. We will refer to this as Table 2 in this opinion.

## TABLE NO. 2

## 1978 SCHOOL TAX LEVIES BY DISTRICT

| COUNTY District | Assessed Val. Per Pupil | State School Levy | General County Levy | Equalization Levy | Special District Levy | Bond & Interest Levy | Other School Levy | Total School Levy |
|---|---|---|---|---|---|---|---|---|
| **ALBANY** | | | | | | | | |
| 1 Laramie | $ 17,525 | 6.000 | 1.420 | 12.000 | 25.000 | 9.000 | | 53.420 |
| **BIG HORN** | | | | | | | | |
| 1 Byron | 42,538 | 6.000 | 1.100 | 12.000 | 25.000 | 9.040(1) | | 53.140 |
| 2 Lovell | 44,885 | 6.000 | 1.100 | 12.000 | 23.900 | 2.630(2) | | 45.630 |
| 3 Greybull | 31,077 | 6.000 | 1.100 | 12.000 | 25.000 | .800(3) | | 44.900 |
| 4 Basin | 29,609 | 6.000 | 1.100 | 12.000 | 25.000 | 6.350(4) | | 50.450 |
| **CAMPBELL** | | | | | | | | |
| 1 Gillette | 108,438 | 6.000 | .283 | 12.000 | 25.000 | 2.332 | | 45.615 |
| **CARBON** | | | | | | | | |
| 1 Rawlins | 46,595 | 6.000 | .496 | 12.000 | 25.000 | 7.140 | | 50.636 |
| 2 Saratoga | 79,469 | 6.000 | .496 | 12.000 | 22.000 | 7.000 | | 47.496 |
| **CONVERSE** | | | | | | | | |
| 1 Douglas | 83,190 | 6.000 | .305 | 12.000 | 22.958 | 7.498 | | 48.761 |
| 2 Glenrock | 61,741 | 6.000 | .305 | 12.000 | 25.000 | 3.130 | | 46.435 |
| **CROOK** | | | | | | | | |
| 1 Sundance | 35,331 | 6.000 | .921 | 12.000 | 25.000 | 3.097 | | 47.018 |
| **FREMONT** | | | | | | | | |
| 1 Lander Elem. | 46,057 | 6.000 | .960 | 12.000 | 15.000 | 2.360 | | 36.320 |
| 2 Dubois | 22,689 | 6.000 | .960 | 12.000 | 25.000 | 4.000 | | 47.960 |
| 6 Pavillion | 36,327 | 6.000 | .960 | 12.000 | 25.000 | 4.910 | | 48.870 |
| 9 Jeffrey City | 37,540 | 6.000 | .960 | 12.000 | 15.000 | 12.790 | | 46.750 |
| 14 Ethete | 13,070 | 6.000 | .960 | 12.000 | 15.000 | .640 | | 34.600 |
| 21 Ft. Washakie | 36,567 | 6.000 | .960 | 12.000 | 15.000 | 11.980 | | 45.940 |
| 24 Shoshoni | 80,738 | 6.000 | .960 | 12.000 | 25.000 | 3.220 | | 47.180 |
| 25 Riverton | 21,501 | 6.000 | .960 | 12.000 | 25.000 | 7.090 | | 51.050 |
| 27 Hudson | 7,944 | 6.000 | .960 | 12.000 | 15.000 | - - | | 33.960 |
| 38 Arapahoe | 3,469 | 6.000 | .960 | 12.000 | 15.000 | 5.030 | 5.000* | 43.990 |
| Lander Valley HS | 102,191 | - - | - - | - - | 10.000 | 2.060 | | 12.060 |

* Tuition

(1) 5.69 mills of this levy applies only to $2,419,126 in old districts # 19 and 20.

(2) Levy applies only to $6,845,599 in old District #3.

(3) Levy applies only to $6,034,645 in old H.S. District #1.

(4) Levy applies only to $4,972,008 in old District #17.

## 1978 SCHOOL TAX LEVIES BY DISTRICT

| COUNTY District | Assessed Val. Per Pupil | State School Levy | General County Levy | Equalization Levy | Special District Levy | Bond & Interest Levy | Other School Levy | Total School Levy |
|---|---|---|---|---|---|---|---|---|
| GOSHEN | | | | | | | | |
| 1 Torrington | $ 14,078 | 6.000 | 2.413 | 12.000 | 25.000 | 1.746 | | 47.159 |
| HOT SPRINGS | | | | | | | | |
| 1 Thermopolis | 91,014 | 6.000 | .322 | 12.000 | 15.001 | 1.646 | | 34.969 |
| JOHNSON | | | | | | | | |
| 1 Buffalo | 40,537 | 6.000 | .705 | 12.000 | 25.000 | 6.700 | | 50.405 |
| LARAMIE | | | | | | | | |
| 1 Cheyenne | 10,899 | 6.000 | 1.930 | 12.000 | 25.000 | 12.000 | | 56.930 |
| 2 Pine Bluffs | 27,358 | 6.000 | 1.930 | 12.000 | 25.000 | 1.430 | | 46.360 |
| LINCOLN | | | | | | | | |
| 1 Kemmerer | 74,022 | 6.000 | .540 | 12.000 | 25.000 | 5.590 | | 49.130 |
| 2 Afton | 25,571 | 6.000 | .540 | 12.000 | 25.000 | 2.980 | | 46.520 |
| NATRONA | | | | | | | | |
| 1 Casper | 15,747 | 6.000 | 1.350 | 12.000 | 25.000 | 5.850 | | 50.200 |
| NIOBRARA | | | | | | | | |
| 1 Lusk | 36,027 | 6.000 | 1.019 | 12.000 | 25.000 | - - | | 44.019 |
| PARK | | | | | | | | |
| 1 Powell | 33,536 | 6.000 | .503 | 12.000 | 28.000 | - - | | 43.503 |
| 6 Cody | 38,464 | 6.000 | .503 | 12.000 | 25.000 | 3.289 | | 46.792 |
| 16 Meeteetse | 209,543 | 6.000 | .503 | 12.000 | 15.945 | 1.775 | | 36.223 |
| PLATTE | | | | | | | | |
| 1 Wheatland | 35,489 | 6.000 | .910 | 12.000 | 25.000 | 1.180 | | 45.090 |
| 2 Guernsey | 21,969 | 6.000 | .910 | 12.000 | 25.000 | 2.710 | | 46.620 |
| SHERIDAN | | | | | | | | |
| 1 Ranchester | 13,912 | 6.00 | 1.180 | 12.000 | 25.000 | 16.653 | | 60.833 |
| 2 Sheridan | 19,969 | 6.000 | 1.180 | 12.000 | 25.000 | 8.653 | | 52.833 |
| 3 Clearmont | 28,285 | 6.000 | 1.180 | 12.000 | 25.000 | 1.865 | | 46.045 |

7

## 1978 SCHOOL TAX LEVIES BY DISTRICT

**8**

| COUNTY District | Assessed Val. Per Pupil | State School Levy | General County Levy | Equalization Levy | Special District Levy | Bond & Interest Levy | Other School Levy | Total School Levy |
|---|---|---|---|---|---|---|---|---|
| **SUBLETTE** | | | | | | | | |
| 1 Pinedale | $ 71,121 | 6.000 | .479 | 12.000 | 20.889 | 4.435 | | 43.803 |
| 9 Big Piney | 87,994 | 6.000 | .479 | 12.000 | 23.690 | 8.383 | | 50.552 |
| **SWEETWATER** | | | | | | | | |
| 1 Rock Springs | 77,609 | 6.000 | .310 | 12.000 | 22.231 | 3.670 | 2.690** | 46.901 |
| 2 Green River | 51,039 | 6.000 | .310 | 12.000 | 25.000 | 10.240 | | 53.550 |
| **TETON** | | | | | | | | |
| 1 Jackson | 24,082 | 6.000 | .900 | 12.000 | 25.000 | 6.750 | | 50.650 |
| **UINTA** | | | | | | | | |
| 1 Evanston | 20,214 | 6.000 | 1.550 | 12.000 | 25.000 | 5.040 | | 49.590 |
| 4 Mountain View | 11,615 | 6.000 | 1.550 | 12.000 | 25.000 | 3.770 | | 48.320 |
| 6 Lyman | 11,171 | 6.000 | 1.550 | 12.000 | 25.000 | 10.660 | | 55.210 |
| **WASHAKIE** | | | | | | | | |
| 1 Worland | 19,446 | 6.000 | 1.087 | 12.000 | 25.000 | 9.511 | | 53.598 |
| 2 Ten Sleep | 32,198 | 6.000 | 1.087 | 12.000 | 25.000 | -- | | 44.087 |
| **WESTON** | | | | | | | | |
| 1 Newcastle | 26,896 | 6.000 | .972 | 12.000 | 25.000 | 6.554 | | 50.526 |
| 7 Upton | 36,200 | 6.000 | .972 | 12.000 | 25.000 | 2.552 | | 46.524 |

** Building Fund

The tremendous variation in assessed valuation and the amount available per student in each school district is dramatically illustrated by the following statistics [19]:

## TABLE NO. 3

### 1978 PROPERTY VALUATIONS BY COUNTY AND SCHOOL DISTRICT

| COUNTY<br>District | 1978<br>County<br>Valuation | 1978<br>District<br>Valuation | 1977-78<br>ADM | Valuation<br>Per ADM [20] |
|---|---|---|---|---|
| ALBANY | $ 70,818,825 | | | |
| 1 Laramie | | $ 70,818,825 | 4,041 | $ 17,525 |
| BIG HORN | 79,131,336 | | | |
| 1 Byron | | 30,627,098 [1] | 720 | 42,538 |
| 2 Lovell | | 36,536,698 [2] | 814 | 44,885 |
| 3 Greybull | | 21,847,443 | 703 | 31,077 |
| 4 Basin | | 15,988,733 [3] | 540 | 29,609 |
| CAMPBELL | 494,261,159 | | | |
| 1 Gillette | | 494,261,159 | 4,558 | 108,438 |
| CARBON | 230,860,257 | | | |
| 1 Rawlins | | 125,434,244 [4] | 2,692 | 46,595 |
| 2 Saratoga | | 132,555,036 | 1,668 | 79,469 |
| CONVERSE | 209,716,635 | | | |
| 1 Douglas | | 154,150,141 | 1,853 | 83,190 |
| 2 Glenrock | | 55,566,494 | 900 | 61,741 |
| CROOK | 47,025,487 | | | |
| 1 Sundance | | 47,025,487 | 1,331 | 35,331 |
| FREMONT | 220,169,169 | | | |
| 1 Lander Elementary | | 66,229,861 | 1,438 | 46,057 |
| 2 Dubois | | 8,553,674 | 377 | 22,689 |
| 6 Pavillion | | 17,909,296 | 493 | 36,327 |
| 9 Jeffrey City | | 13,364,083 | 356 | 37,540 |
| 14 Ethete | | 4,626,811 | 354 | 13,070 |
| 21 Ft. Washakie | | 9,763,423 | 267 | 36,567 |
| 24 Shoshoni | | 32,618,327 | 404 | 80,738 |
| 25 Riverton | | 65,534,751 | 3,048 | 21,501 |
| 27 Hudson | | 746,772 | 94 | 7,944 |
| 38 Arapahoe | | 822,171 [5] | 237 | 3,469 |
| Lander Valley High School | | 94,730,950 | 927 | 102,191 |
| GOSHEN* | $ 37,356,696 | | | |
| 1 Torrington | | $ 36,561,546 [6] | 2,597 | $ 14,078 |
| HOT SPRINGS | 92,743,208 | | | |
| 1 Thermopolis | | 92,743,208 | 1,019 | 91,014 |
| JOHNSON | 56,792,256 | | | |
| 1 Buffalo | | 56,792,256 | 1,401 | 40,537 |
| LARAMIE | 165,698,772 | | | |
| 1 Cheyenne | | 144,058,644 | 13,217 | 10,899 |
| 2 Pine Bluffs | | 21,640,128 | 791 | 27,358 |
| LINCOLN* | 126,841,116 | | | |
| 1 Kemmerer | | 67,508,273 | 912 | 74,022 |
| 2 Afton | | 48,789,734 | 1,908 | 25,571 |
| NATRONA | 218,421,423 | | | |
| 1 Casper | | 218,421,423 | 13,871 | 15,747 |
| NIOBRARA | 22,657,481 | | | |
| 1 Lusk | | 22,949,037 [7] | 637 | 36,027 |
| PARK* | 227,401,533 | | | |
| 1 Powell | | 64,859,212 | 1,934 | 33,536 |
| 6 Cody | | 89,736,155 | 2,333 | 38,464 |
| 16 Meeteetse | | 46,937,530 | 224 | 209,543 |
| PLATTE* | 67,389,191 | | | |
| 1 Wheatland | | 59,764,098 [8] | 1,684 | 35,489 |
| 2 Guernsey | | 8,128,687 [9] | 370 | 21,969 |

19. Statistical Report Series No. 1, 1978 School District Property Valuations, Mill Levies and Bonded Debt, Division of Planning, Evaluation, and Information, State Department of Education, pages 1–3. We will refer to this as Table 3.

20. ADM is an abbreviation for:
"'Average daily membership' [which] means the aggregate number of pupils present plus the aggregate number of pupils absent, divided by the actual number of days the school is in session for the year. Pupils who have withdrawn from school or who have been absent for more than ten (10) consecutive calendar days shall not be counted as members;" Section 21–13–305(a)(i), W.S.1977.

## 1978 PROPERTY VALUATIONS BY COUNTY AND SCHOOL DISTRICT

| COUNTY District | 1978 County Valuation | 1978 District Valuation | 1977-78 ADM | Valuation Per ADM 20/ |
|---|---|---|---|---|
| SHERIDAN | $ 84,730,942 | | | |
| 1 Ranchester | | $ 9,960,985 | 716 | $ 13,912 |
| 2 Sheridan | | 70,612,045 | 3,536 | 19,969 |
| 3 Clearmont | | 4,157,912 | 147 | 28,285 |
| SUBLETTE | 78,299,489 | | | |
| 1 Pinedale | | 38,334,252 (10) | 539 | 71,121 |
| 9 Big Piney | | 50,508,346 | 574 | 87,994 |
| SWEETWATER* | 553,059,403 | | | |
| 1 Rock Springs | | 371,282,274 | 4,784 | 77,609 |
| 2 Green River | | 154,648,106 | 3,030 | 51,039 |
| TETON | 37,302,634 . | | | |
| 1 Jackson | | 37,302,634 | 1,549 | 24,082 |
| UINTA | 38,607,317 | | | |
| 1 Evanston | | 23,812,508 | 1,178 | 20,214 |
| 4 Mountain View | | 7,131,427 | 614 | 11,615 |
| 6 Lyman | | 7,663,382 | 686 | 11,171 |
| WASHAKIE | 42,202,035 | | | |
| 1 Worland | | 35,859,011 | 1,844 | ,,.,.. |
| 2 Ten Sleep | | 6,343,024 | 197 | 32,198 |
| WESTON | 50,291,917 | | | |
| 1 Newcastle | | 34,400,178 | 1,279 | 26,896 |
| 7 Upton | | 15,891,739 | 439 | 36,200 |
| STATE TOTALS | $ 3,251,778,281 | $ 3,251,778,281 | 91,825 | $ 35,413 |

(1) Includes $1,973,377 from Park County.
(2) Includes $17,019,527 from Park County.
(3) Includes $6,875,732 from Park County.
(4) Includes $27,129,023 from Sweetwater County.
(5) High school district valuation is comprised of the combined valuation
 of Fremont County districts #1, 9, 14, 21 and 27.
NOTE: Counties starred (*) have a portion of their valuation
assigned, for school purposes only, to a school district in
another county, as shown in the numbered footnotes.
(6) Includes $108,248 from Platte County.
(7) Includes $291,556 from Goshen County.
(8) Includes $541,651 from Goshen County.
(9) Includes $70,191 from Goshen County.
(10, Includes $10,543,109 from Lincoln County.

As will be noted, the assessed valuation per student in school districts varies from $209,543 to $10,899, (School Districts 27 and 38, Fremont County, were excluded from consideration because of unaccounted contributions from the tribes and Bureau of Indian Affairs)—a ratio of over 21 to 1. The state average is $35,399 per student.

The state's foundation program does not adequately equalize the amounts available to Wyoming districts. As indicated in Table 2, supra, all school districts, with few exceptions, are receiving the maximum taxes that can be realized from authorized levies, other than from the general county levy. Even so, the statistics revealed by Statistical Report Series Nos. 1 [pages 1, 2, and 3 (Table 3)] and 3, Wyoming Public Schools Fund Accounting and Reporting, 1977–78, State Department of Education, pages 8 and 9, attached as Appendix A, the poor districts show a consistent pattern of

less total revenue per student than the rich districts based on assessed valuation per student. For example, using the school district parties to this action:

| District | Assessed Value Per Student | Total Revenue Per Student |
|---|---|---|
| **Plaintiffs** | | |
| Washakie No. 1 | $19,446 | $1,610 |
| Uinta No. 6 | 11,171 | 1,770 |
| Fremont No. 25 | 21,501 | 1,697 |
| **Defendants** | | |
| Park No. 16 | 209,543 | 4,326 |
| Campbell No. 1 | 108,438 | 3,299 |
| Converse No. 1 | 83,190 | 2,845 |
| Hot Springs No. 1 | 91,014 | 3,033 |
| Carbon No. 2 | 79,469 | 2,609 |
| Sublette No. 9 | 87,994 | 3,099 |
| Sweetwater No. 1 | 77,609 | 2,502 |
| Lincoln No. 1 | 74,022 | 2,303 |

The foregoing are impressive but the complete tabulation for all counties and districts shows that the property-richer school districts uniformly have more revenue per student than the property-poorer ones:

| COUNTY | District | Assessed Val. Per Pupil [21] | Total Revenue [22] $/ADM | Total ADM [23] |
|---|---|---|---|---|
| **ALBANY** | | | | |
| | 1 Laramie | $ 17,525 · | $1,749 | 4,041 |
| **BIG HORN** | | | | |
| | 1 Byron | 42,538 | 2,677 | 720 |
| | 2 Lovell | 44,885 | 1,864 | 814 |
| | 3 Greybull | 31,077 | 1,926 | 703 |
| | 4 Basin | 29,609 | 2,248 | 540 |
| **CAMPBELL** | | | | |
| | 1 Gillette | 108,438 | 3,299 | 4,558 |
| **CARBON** | | | | |
| | 1 Rawlins | 46,595 | 1,841 | 2,692 |
| | 2 Saratoga | 79,469 | 2,609 | 1,668 |
| **CONVERSE** | | | | |
| | 1 Douglas | 83,190 | 2,845 | 1,853 |
| | 2 Glenrock | 61,741 | 2,249 | 900 |
| **CROOK** | | | | |
| | 1 Sundance | 35,331 | 2,146 | 1,331 |
| **FREMONT** | | | | |
| | 1 Lander Elem. | 46,057 | 1,487 | 1,438 |
| | 2 Dubois | 22,689 | 2,002 | 377 |
| | 6 Pavillion | 36,327 | 2,436 | 493 |
| | 9 Jeffrey City | 37,540 | 1,545 | 356 |
| | 14 Ethete | 13,070 | 3,126 | 354 |
| | 21 Ft. Washakie | 36,567 | 3,070 | 267 |
| | 24 Shoshoni | 80,738 | 2,146 | 404 |

21. Figures derived from State Department of Education, Statistical Report Series, No. 1, 1978 School District Property Valuations, Mill Levies and Bonded Debt, pp. 6–8. Table 3.

22. Figures derived from State Department of Education, Statistical Report Series, No. 3, Wyoming Public Schools Fund Accounting and Reporting 1977–78, pp. 8–9. Appendix A to this opinion.

23. Figures derived from Table 3.

| COUNTY<br>District | Assessed Val.<br>Per Pupil [21] | Total Revenue [22]<br>$/ADM | Total ADM [23] |
|---|---|---|---|
| 25 Riverton | 21,501 | 1,697 | 3,048 |
| 27 Hudson | 7,944 | 1,721 | 94 |
| 38 Arapahoe | 3,469 | 3,844 | 237 |
| Lander Valley HS | 102,191 | 2,621 | 927 |
| **GOSHEN** | | | |
| 1 Torrington | 14,078 | 2,098 | 2,597 |
| **HOT SPRINGS** | | | |
| 1 Thermopolis | 91,014 | 3,033 | 1,019 |
| **JOHNSON** | | | |
| 1 Buffalo | 40,537 | 2,113 | 1,401 |
| **LARAMIE** | | | |
| 1 Cheyenne | 10,899 | 1,583 | 13,217 |
| 2 Pine Bluffs | 27,358 | 2,642 | 791 |
| **LINCOLN** | | | |
| 1 Kemmerer | 74,022 | 2,303 | 912 |
| 2 Afton | 25,571 | 1,780 | 1,908 |
| **NATRONA** | | | |
| 1 Casper | 15,747 | 1,484 | 13,871 |
| **NIOBRARA** | | | |
| 1 Lusk | 36,027 | 2,124 | 637 |
| **PARK** | | | |
| 1 Powell | 33,536 | 1,759 | 1,934 |
| 6 Cody | 38,464 | 1,837 | 2,333 |
| 16 Meeteetse | 209,543 | 4,326 | 224 |
| **PLATTE** | | | |
| 1 Wheatland | 35,489 | 1,703 | 1,684 |
| 2 Guernsey | 21,969 | 2,037 | 370 |
| **SHERIDAN** | | | |
| 1 Ranchester | 13,912 | 2,122 | 716 |
| 2 Sheridan | 19,969 | 1,474 | 3,536 |
| 3 Clearmont | 28,285 | 2,415 | 147 |
| **SUBLETTE** | | | |
| 1 Pinedale | 71,121 | 2,560 | 539 |
| 9 Big Piney | 87,994 | 3,099 | 574 |
| **SWEETWATER** | | | |
| 1 Rock Springs | 77,609 | 2,502 | 4,784 |
| 2 Green River | 51,039 | 2,183 | 3,030 |
| **TETON** | | | |
| 1 Jackson | 24,082 | 1,756 | 1,549 |
| **UINTA** | | | |
| 1 Evanston | 20,214 | 1,598 | 1,178 |
| 4 Mountain View | 11,615 | 1,714 | 614 |
| 6 Lyman | 11,171 | 1,770 | 686 |
| **WASHAKIE** | | | |
| 1 Worland | 19,446 | 1,610 | 1,844 |
| 2 Ten Sleep | 32,198 | 2,271 | 197 |
| **WESTON** | | | |
| 1 Newcastle | 26,896 | 1,665 | 1,279 |
| 7 Upton | 36,200 | 2,082 | 439 |

The column entitled State Revenue shown in Appendix A to this opinion includes not only the Foundation Fund distribution but also money from the land income fund which all districts received as a flat grant per student, Taylor Grazing money and other miscellaneous state money in relatively minor amounts. See Table 1. The income from sources other than Foundation Funds decreases the impact of foundation grants in equalizing school district revenue and exacerbates the disparity.

It is realized that there are variations which can be partially explained but the net result cannot be justified. See Table 1 for the several factors which can affect the amount of money received by each school district in each county. Some of the revenue of the poorer counties, as shown in Appendix A, includes large blocks of federal money which brings up their revenue per student. If we multiply the differences per student by the total students affected, the figures more forcefully demonstrate the disparity. For example, for each 100 students in Washakie District No. 1, $161,000 for their education is available. In Converse District No. 1, $284,500 for the same number is available; in Campbell District No. 1, $329,900 is available.

These disparities demonstrated throughout by the various statistical tables can lead to but one conclusion: the quality of a child's education in Wyoming, measured in terms of dollars available for that purpose, is dependent upon the property tax resources of his school district. The right to an education cannot constitutionally be conditioned on wealth in that such a measure does not afford equal protection. *Serrano v. Priest*, 1971, 5 Cal.3d 584, 96 Cal. Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187; *Serrano v. Priest*, 1976, 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929; *Horton v. Meskill*, 1977, 172 Conn. 615, 376 A.2d 359. Those courts have approached the problem through the equal protection provisions of their various state constitutions and opened the door to school finance reform. See also, *Robinson v. Cahill*, 1972, 118 N.J.Super. 223, 287 A.2d 187, as modified, 1973, 67 N.J. 473,

303 A.2d 273, reaching the same result through a different constitutional guarantee similar to § 9, Art. VII, Wyoming Constitution, supra. We recognize that there are decisions to the contrary, but we reject them.

Section 34, Art. I, Wyoming Constitution provides that "All laws of a general nature shall have a uniform operation." This provision is nearly identical to § 16, Art. 4, of the California Constitution, which reads, "All laws of a general nature have uniform operation." This court has held that provision to be the equivalent of the "equal protection" words of the Fourteenth Amendment to the Constitution of the United States. A state may enlarge rights under the Fourteenth Amendment announced by the Supreme Court of the United States, which are considered minimal, and thus a state constitutional provision may be more demanding than the equivalent federal constitutional provision. *Nehring v. Russell*, Wyo.1978, 582 P.2d 67. When the California Supreme Court first held a system of school financing, similar to that of Wyoming, violative of the Fourteenth Amendment to the United States Constitution, it also observed that California's constitutional provisions afforded the same right. It found that such a system makes the quality of a child's education dependent upon the resources of his school district and held that the right to an education in public schools cannot be conditioned on wealth because it denies equal protection. *Serrano v. Priest*, 1976, supra. Reinforcing the equal protection requirements of § 34, Art. I, Wyoming Constitution, is the duty imposed upon the legislature by § 1, Art. VII, Wyoming Constitution, to " * * * provide a complete and uniform system of public instruction * * *," which words are compatible with and of the same tenor as the language "All laws of a general nature shall have a uniform operation." Equal protection is thereby projected from general to specific application to the school system of the state.

In a later decision, following remand and return to the California Supreme Court,

*Serrano v. Priest*, 1976, reh. den. and modified, 1977, 18 Cal.3d 728, 135 Cal.Rptr. 345, 557 P.2d 929, the court abandoned the Fourteenth Amendment concept because of the *San Antonio School District v. Rodriguez*, supra, decision of the United States Supreme Court which held that the right to education was not explicitly guaranteed by the Constitution of the United States. The California court, however, did hold the California system unconstitutional under the equal protection clauses of the California Constitution, which are similar to those we have in Wyoming.

The trial which followed *Serrano* I apparently developed nothing which altered the inherent defects in the California system and even after extensive tinkering by the California Legislature. Just as much can be developed from statistics of which we take judicial notice. The whole matter is one of financing explicitly provided for by constitutional language and implementing statutory language. The system is plainly illustrated by the materials of which we have taken judicial notice. The California court in *Serrano* II reverted to its opinion in *Serrano* I which was decided without the benefit of a trial. No trial is necessary in this case because, as a matter of law, the statutory structure is inherently defective and the now obvious disparities demand that the system's constitutional infirmities be remedied.

The reasoning which we approve of and which we have applied to the instant case involves two different tests which are designed to determine if statutory classifications meet equal protection requirements. The first test is employed where the interest affected is an ordinary one and the second where fundamental interests are at issue. When an ordinary interest is involved, then a court merely examines to determine whether there is a rational relationship between a classification made by the statute or statutes being viewed and a legitimate state objective. When a fundamental interest is affected or if a classification is inherently suspect, then the classification must be subjected to strict scrutiny to determine if it is necessary to achieve a compelling state interest. In addition, this test requires that the state establish that there is no less onerous alternative by which its objective may be achieved. *Horton v. Meskill*, supra.[24]

In the light of the emphasis which the Wyoming Constitution places on education, there is no room for any conclusion but that education for the children of Wyoming is a matter of fundamental interest. In addition to the Wyoming constitutional provisions we have cited and specifically applied in this opinion, there are two others of a general nature: § 23, Art. I,[25] and § 28, Art. XXI[26] which reemphasize the fundamental importance placed on education by the founders of our state. A favorite expression referred to by other state courts to emphasize the basic importance of education is found in *Brown v. Board of Education of Topeka*, 1954, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873, 880, 38 A.L.R.2d 1180:

> "Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed

24. The test is discussed in VIII Land and Water Law Review 273, a note by Stephen A. Bartholow, entitled "Equal Protection and the Financing of Public Education in Wyoming." See also, *State ex rel. Mansfield v. State Board of Law Examiners*, Wyo.1979, 601 P.2d 174.

25. Section 23, Art. I, Wyoming Constitution: "The right of the citizens to opportunities for education should have practical recognition. The legislature shall suitably encourage

means and agencies calculated to advance the sciences and liberal arts."

26. Section 28, Art. XXI, Wyoming Constitution: "The legislature shall make laws for the establishment and maintenance of systems of public schools which shall be open to all the children of the state and free from sectarian control."

forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms."

A classification on the basis of wealth is considered suspect, especially when applied to fundamental interests. *Harper v. Virginia Board of Elections*, 1966, 383 U.S. 663, 668, 670, 86 S.Ct. 1079, 1082–1083, 16 L.Ed.2d 169, 173, 174–175; *Serrano v. Priest*, 1971, supra. The need for a foundation program and the fact that, as presently employed due to lack of funds, it falls far short of raising the level of poor counties to that of rich counties, clearly indicates that funds are distributed upon the basis of wealth or lack of it. The classification is therefore suspect. The respective tax bases of the school districts of this state and their per-student resources reflect discordant correlations which plainly demonstrate the failure of the current system to provide equal educational opportunity.

The burden is therefore on those defending the classification once its unequal results are known. As nearly as we can determine from the brief of the appellees, their position is principally, if not solely, that the school finance system of Wyoming does provide an equal educational opportunity for all Wyoming children and that financial status is "only one small part in determining the quality of education Wyoming children receive." However, the proposition is unsupported by any convincing argument or authority. While we would agree that there are factors other than money involved in imparting education, those factors are not easy of measurement and comparison. There is some general disagreement over the degree to which money counts. However, the legislature has here set up a system which fosters and predetermines great disparities in spending. It would be unacceptable logic to deduce that the wealthy counties are squandering their money merely from the fact the poorer counties are getting along just fine and providing an adequate education on the lesser amounts per child they have. For the state and the wealthy districts to put forth the assertion that money is not everything is making just such an argument. Money for school district operations, except for the foundation fund operation and perhaps some federal funds, is not distributed upon the basis of need for quality education. Equality of dollar input is manageable. There is no other viable criterion or test that the appellees show to exist, and our exploration of the subject has resulted only in discovery of a quagmire of speculation, so slippery that it evades any secure grasp for judicial decision making. It is nothing more than an illusion to believe that the extensive disparity in financial resources does not relate directly to quality of education.

It is our view that until equality of financing is achieved, there is no practicable method of achieving equality of quality. To decide otherwise only places the whole question, as observed by the trial judge, in a posture of delay and further expensive litigation of questionable value. There has already been too much litigation to decide questions, the ultimate answers to which have for years been suspected, recognized by the legislature, noticed by this court before, and which now are obvious. Litigation has been spawned in attempts to seize additional property for taxing purposes, as was the case in *Hinkle*. The Fremont County attempt to reorganize has been a hotbed of dissention for ten years and only last year was resolved, at least on the local level. See *Geraud v. Schrader*, Wyo.1975, 531 P.2d 872, cert. den. sub nom., *Wind River Indian Education Assoc., Inc. v. Ward*, 423 U.S. 904, 96 S.Ct. 205, 46 L.Ed.2d 134. Boundary disputes incessantly flare up. See most recently, *Yates v. State Committee on School District Organization*, Wyo.1979, 598 P.2d 11. Legal battles continue, initiated by those that have not, to

invade the territory of school districts that have. Ramparts of litigation are erected in defense. Litigation more often than not worsens the problem when it is not reaching the roots of the evil. Only a temporary truce results. Continual gerrymandering, in an attempt to equalize, was never a solution, and what little good may have been achieved by it in the past, serves only to reemphasize the ever-deepening chasms of disparity that exist now.

 The cases we cite make it clear that the state has the burden of demonstrating a compelling interest of its own which is served by the challenged legislation and which cannot be satisfied by any other convenient legal structure. The state has failed to make any showing that other methods are not available or possible. We are satisfied that the Wyoming Constitution, even as it presently stands, leaves plenty of room for the creation of equality in financing.

We are not attempting to isolate any particular statute as unconstitutional because it denies equal protection but we examine the entire system from organization of school districts through tax bases and levies and distribution of foundation funds, all of which have a bearing upon the disparity which exists. If we were to focus upon any particular statute, highly suspect is § 21–13–101, W.S.1977. It has no specific constitutional permission or limitation which authorizes the levy of 25 mills with an override of 3 mills if approved by the voting on the proposition, as a special school district tax. This single tax is greater than the sum of the 6 mills state tax (§ 15, Art. XV), 12 mills mandatory county tax for support of public schools (§ 17, Art. XV), and up to 3 mills from the general county tax (§ 5, Art. XV as limited by §§ 21–13–202 through 21–13–205, W.S.1977), total, 21 mills. We do not look at the special school district tax from the point of view that a special school district tax cannot be authorized and levied. That a 25 mill special school district levy is unconstitutional has not been argued by any party to this case. It is that tax, however, which creates an

opportunity for some school districts to have greater financial resources for all school purposes including capital school building construction than do others. We would suggest an investigation of the feasibility, without leaving the impression of our advance approval—which we cannot give— of a special school district tax levied throughout the state in each county and paid into a state foundation fund, or something similar, for distribution under a legislative formula on an equitable basis throughout the state.

With rare exception, all school districts request a levy of the 25 mill district tax from the richest to the poorest: Park County No. 16, Meeteetse, with a 1978 assessed value per student of $209,543, to Uinta County No. 6, Lyman, an assessed value per student of $11,171. See applicable chart. As also said in *Serrano* I, 96 Cal.Rptr. 601, 487 P.2d at 1252, the commercial and industrial property which augments a district's tax base is distributed unevenly throughout the state. To allot more educational dollars to the children of one district than to those of another merely because of the fortuitous presence of such property is to make the quality of a child's education dependent upon the location of private, commercial, industrial and mineral establishments—an irrelevant measure for purposes of school financing. The Foundation Fund is distributed upon the basis of need to meet local requirements according to uniform measurements, all dealing in money as a measure. Tax money collected locally is not based on need having anything to do with quality of education, but is received solely on the arbitrary standard of assessed valuation. It is primarily the uncontrollable, locally collected tax money which defeats the balancing effect intended as a function of the Foundation Fund.

With amendment of § 8, Art. VII, Wyoming Constitution, supra permanent land income from school lands is now available for equitable distribution, though the legislature at its last session retained the flat grant concept as provided in the same section before amendment. There appears to

be no recognition given the constitutional amendment, but by § 1, ch. 75, Session Laws of Wyoming, 1979, the legislature changed § 21–13–301, W.S.1977, from distribution "pro rata among the several counties of the state according to the number of children of school age in each as determined by reference to the last preceding annual school enumeration" to "pro rata among the several counties of the state according to the number of children of school age in each as determined by *the average daily membership of the school districts within each county for the preceding school year.*" Use of the ADM formula only averages pupils present and absent to determine the number of pupils for computation purposes. We suspect the land income distribution just described, as contributing to the unconstitutional aspects of the legislative scheme of school financing.

In the many cases decided on the subject are references to in-depth scholarly studies made on the subject of school financing, particularly the *Serrano* cases, supra, and the United States Supreme Court case of *San Antonio School District v. Rodriguez,* supra. See also, Anno., "Validity of Basing Public School Financing System on Local Property Taxes," 41 A.L.R.3d 1220 and pocket parts. Legislative committees would certainly have those available. Everything from the abolition of local school districts and placing all school administration on a statewide basis, to dividing the state into a few multi-county districts, to making all mineral, commercial and industrial property in the state subject to a state tax for school purposes have been suggested, but we make no recommendations in that regard. Reorganization of school districts within counties for greater parity appears as an option in one study, but Wyoming has tried that with the Wyoming School District Organization Law of 1969, supra. It was probably effective to a degree for counties, but statewide disparity remains. Amendment of the Wyoming Constitution may be part of a selected course, after all legislative efforts under current constitutional provisions fail to bring maximum equality.

■ We only express the constitutional standard and hold that whatever system is adopted by the legislature, it must not create a level of spending which is a function of wealth other than the wealth of the state as a whole. There are alternatives and combinations of alternatives suggested by the many comprehensive reference works alluded to. The ultimate solutions must be shaped by the legislature. The assignment has complexities but is not insoluble.

So that there may be no question about this, we wish to make clear that we are not suggesting that each school district receive exactly the same number of dollars per pupil as every other school district. We understand that there are special problems and amounts may be distributed in a mode similar to the foundation fund which takes into consideration various balancing factors. A state formula can be devised which will weight the calculation to compensate for special needs—educational cost differentials. We do not purport to exhaustedly list the factors or methodology that should be employed. We only proscribe any system which makes the quality of a child's education a function of district wealth. We hold that exact or absolute equality is not required. There must be allowance for variances in individuals, groups and local conditions. All precedents are in accord on this proposition. In fact, a flat rate per student distribution of available resources may generate a constitutionally offensive classification, particularly in the light of those presently existing constitutional provisions such as § 17, Art. XV, which mandates the levy of a particular number of mills,[12] and § 5, Art. VII, which seems to require payment of fines and penalties to the county where collected and distributed to the school districts therein. By reason of the location of interstate highways, abutting counties may have an advantage. It is noted on Table 1 that in 1978, $2,397,864 in fines and forfeitures statewide were collected. We were unable to locate a report, of which we can

take judicial notice, that would disclose how those are distributed. Certain federal funds may be frozen into particular areas. These matters are discussed only as a caveat that there may be inequity created·by flat grants.

 We see no reason to give particular attention to the question of finances for the physical facilities with which to carry on the process of education. It is a part of the total educational package and tarred with the same brush of disparate tax resources. The only constitutional limitation with respect to school buildings is found in § 5, Art. XVI, Wyoming Constitution, wherein it is provided that "No school district shall in any manner create any indebtedness exceeding ten per cent (10%) on the assessed value of the taxable property therein for the purpose of acquiring land, erection, enlarging and equipping of school buildings." There is no constitutional requirement that school buildings must be built by creation of debt. There are other areas of consideration, for example, a statewide reserve fund for building construction. The point is that statewide availability from total state resources for building construction or contribution to school buildings on a parity for all school districts is required just as for other elements of the educational process. The legislature has worked in that direction. See §§ 21–15–101, et seq., W.S.1977, providing for school district capital construction entitlements. It is noticed that § 1, Art. VII, Wyoming Constitution, embraces "free elementary schools of every needed kind and grade" with a "university" and other necessary institutions to carry on "the establishment * * * of a complete and uniform system of public instruction." An examination of past appropriations of funds for the University of Wyoming includes building construction. Compare §§ 15 and 16, Art. VII, Wyoming Constitution pertaining to the University of Wyoming, with those pertaining to elementary schools.

We have pointed up various potential solutions in this opinion only for the purpose of opening up areas of exploration for the legislature and not to specify any particular course. The goal in any case is to arrive at financial parity. It is realized that the presently existing body of statutory and constitutional law has been developed as a result of legislative action over the course of our statehood in an effort to keep pace with changing social and economic conditions. The legislature has made valiant and sincere efforts to arrange the financing of an adequate school program, using a combination of local and state funds.· It has only been since 1971 that a successful attack has won in the courts so that an enlightened course of reasoning is available to guide reform from an inequitable disparity in spendable funds for education which has relied too long and too heavily on the local property tax. As one legal philosopher has put it, the rule has always been present but has only lately been discovered. It will not be an easy task. It will require time for adequate study, drafting of appropriate legislation and transition from the present scheme of financing to one in conformity with the sense of this decision; so this court will provide a period of time in which to convert to constitutional compliance. We consider and order that the conversion be in effect and underway not later than July 1, 1982.

Reversed and remanded to the district court with directions to vacate its order of dismissal, enter judgment consistent with this opinion and retain jurisdiction until a constitutional body of legislation is enacted and in effect, taking such action as may be necessary to assure conformity.

Appendix A to follow.

APPENDIX A

## GENERAL FUND REVENUES PER ADM BY SOURCE 1977-78

| District Location | Local Revenue | Local $/ADM | County Revenue | County $/ADM | State Revenue | State $/ADM | Federal Revenue | Federal $/ADM | Total Revenue | Total Revenue $/ADM |
|---|---|---|---|---|---|---|---|---|---|---|
| ALBANY | | | | | | | | | | |
| 1 Laramie | $ 2,086,435 | $ 516 | $ 1,215,626 | $ 301 | $ 3,716,976 | $ 920 | $ 50,446 | $ 12 | $ 7,069,483 | $1,749 |
| BIG HORN | | | | | | | | | | |
| 1 Byron | 916,088 | 1,272 | 389,072 | 540 | 621,843 | 864 | 716 | 1 | 1,927,718 | 2,677 |
| 2 Lovell | 939,709 | 1,154 | 264,378 | 325 | 312,024 | 383 | 1,281 | ? | 1,517,393 | 1,864 |
| 3 Greybull | 530,430 | 755 | 284,704 | 405 | 539,035 | 767 | - | - | 1,354,168 | 1,926 |
| 4 Basin | 581,508 | 1,077 | 234,375 | 434 | 398,006 | 737 | - | - | 1,213,889 | 2,248 |
| CAMPBELL | | | | | | | | | | |
| 1 Gillette | 9,558,603 | 2,097 | 4,786,820 | 1,050 | 689,657 | 151 | - | - | 15,035,080 | 3,299 |
| CARBON | | | | | | | | | | |
| 1 Rawlins | 2,992,771 | 1,112 | 1,559,865 | 579 | 366,022 | 136 | 38,049 | 14 | 4,956,707 | 1,841 |
| 2 Saratoga | 2,608,456 | 1,564 | 1,198,528 | 719 | 198,959 | 119 | 345,467 | 207 | 4,351,410 | 2,609 |
| CONVERSE | | | | | | | | | | |
| 1 Douglas | 3,479,815 | 1,878 | 1,542,029 | 832 | 250,459 | 135 | - | - | 5,272,303 | 2,845 |
| 2 Glenrock | 1,106,705 | 1,230 | 803,246 | 892 | 114,058 | 127 | - | - | 2,024,008 | 2,249 |
| CROOK | | | | | | | | | | |
| 1 Sundance | 1,419,343 | 1,066 | 757,972 | 569 | 670,046 | 503 | 8,770 | 7 | 2,856,131 | 2,146 |
| FREMONT | | | | | | | | | | |
| 2 Dubois | 225,089 | 597 | 135,834 | 360 | 367,722 | 975 | 25,989 | 69 | 754,635 | 2,002 |
| 6 Pavillion | 435,393 | 883 | 206,258 | 418 | 441,713 | 896 | 117,621 | 239 | 1,200,984 | 2,436 |
| 24 Shoshoni | 375,245 | 929 | 140,881 | 349 | 336,232 | 832 | 14,467 | 36 | 866,825 | 2,146 |
| 25 Riverton | 1,713,070 | 562 | 949,100 | 311 | 2,508,985 | 823 | - | - | 5,171,155 | 1,697 |
| GOSHEN | | | | | | | | | | |
| 1 Torrington | 1,379,489 | 531 | 685,726 | 264 | 3,372,833 | 1,299 | 9,522 | 4 | 5,447,570 | 2,098 |
| HOT SPRINGS | | | | | | | | | | |
| 1 Thermopolis | 1,602,776 | 1,573 | 1,150,237 | 1,129 | 156,771 | 154 | 180,822 | 177 | 3,090,605 | 3,033 |
| JOHNSON | | | | | | | | | | |
| 1 Buffalo | 1,675,541 | 1,196 | 839,738 | 599 | 445,682 | 318 | - | - | 2,960,961 | 2,113 |
| LARAMIE | | | | | | | | | | |
| 1 Cheyenne | 4,102,340 | 310 | 2,601,227 | 197 | 12,828,625 | 971 | 1,385,872 | 105 | 20,918,064 | 1,583 |
| 2 Pine Bluffs | 591,031 | 747 | 254,816 | 322 | 1,234,706 | 1,561 | 9,568 | 12 | 2,090,122 | 2,642 |
| LINCOLN | | | | | | | | | | |
| 1 Kemmerer | 1,404,615 | 1,540 | 568,932 | 624 | 114,885 | 126 | 11,641 | 13 | 2,100,072 | 2,303 |
| 2 Afton | 1,688,308 | 885 | 1,015,388 | 532 | 663,401 | 348 | 29,104 | 15 | 3,396,202 | 1,780 |
| NATRONA | | | | | | | | | | |
| 1 Casper | 6,354,738 | 458 | 3,452,345 | 249 | 10,619,227 | 766 | 159,613 | 12 | 20,585,924 | 1,484 |
| NIOBRARA | | | | | | | | | | |
| 1 Lusk | 698,495 | 1,097 | 361,234 | 567 | 292,948 | 460 | - | - | 1,352,677 | 2,124 |
| PARK | | | | | | | | | | |
| 1 Powell | 1,809,543 | 936 | 1,279,692 | 662 | 310,522 | 161 | 1,892 | 1 | 3,401,648 | 1,759 |

## GENERAL FUND REVENUES PER ADM BY SOURCE 1977-78

| District Location | Local Revenue | Local $/ADM | County Revenue | County $/ADM | State Revenue | State $/ADM | Federal Revenue | Federal $/ADM | Total Revenue | Total Revenue $/ADM |
|---|---|---|---|---|---|---|---|---|---|---|
| 6 Cody | $ 2,483,554 | $1,065 | $ 1,482,123 | $ 635 | $ 320,817 | $ 138 | $ — | $ — | $ 4,286,494 | $1,837 |
| 16 Meeteetse | 715,299 | 3,193 | 220,687 | 985 | 32,031 | 143 | 983 | 4 | 968,999 | 4,326 |
| PLATTE | | | | | | | | | | |
| 1 Wheatland | 976,887 | 580 | 564,509 | 335 | 1,318,572 | 783 | 8,373 | 5 | 2,868,341 | 1,703 |
| 2 Guernsey | 242,477 | 655 | 149,351 | 404 | 361,696 | 978 | — | — | 753,524 | 2,037 |
| SHERIDAN | | | | | | | | | | |
| 1 Ranchester | 389,578 | 544 | 229,851 | 321 | 887,511 | 1,240 | 12,337 | 17 | 1,519,277 | 2,122 |
| 2 Sheridan | 1,338,596 | 379 | 723,341 | 205 | 3,060,895 | 866 | 88,440 | 25 | 5,211,273 | 1,474 |
| 3 Clearmont | 124,681 | 848 | 50,197 | 341 | 180,166 | 1,226 | — | — | 355,044 | 2,415 |
| SUBLETTE | | | | | | | | | | |
| 1 Pinedale | 844,785 | 1,567 | 446,584 | 829 | 70,186 | 130 | 18,193 | 34 | 1,379,748 | 2,560 |
| 9 Big Piney | 1,094,001 | 1,906 | 489,978 | 854 | 76,064 | 133 | 118,979 | 207 | 1,779,021 | 3,099 |
| SWEETWATER | | | | | | | | | | |
| 1 Rock Springs | 7,319,920 | 1,530 | 3,886,101 | 812 | 679,155 | 142 | 86,634 | 18 | 11,971,810 | 2,502 |
| 2 Green River | 3,635,714 | 1,200 | 2,432,863 | 803 | 306,790 | 101 | 238,737 | 79 | 6,614,104 | 2,183 |
| TETON | | | | | | | | | | |
| 1 Jackson | 1,058,288 | 683 | 683,710 | 441 | 919,013 | 593 | 59,727 | 39 | 2,720,737 | 1,756 |
| UINTA | | | | | | | | | | |
| 1 Evanston | 535,439 | 455 | 237,541 | 202 | 1,109,257 | 942 | — | — | 1,882,237 | 1,598 |
| 4 Mountain View | 206,650 | 337 | 124,741 | 203 | 679,211 | 1,106 | 41,766 | 68 | 1,052,368 | 1,714 |
| 6 Lyman | 242,223 | 353 | 143,257 | 209 | 776,920 | 1,133 | 52,092 | 76 | 1,214,491 | 1,770 |
| WASHAKIE | | | | | | | | | | |
| 1 Worland | 902,377 | 489 | 506,493 | 275 | 1,560,746 | 846 | | — | 2,969,616 | 1,610 |
| 2 Ten Sleep | 185,288 | 941 | 76,929 | 391 | 185,171 | 940 | | — | 447,388 | 2,271 |
| WESTON | | | | | | | | | | |
| 1 Newcastle | 1,042,172 | 815 | 527,414 | 412 | 559,743 | 438 | | — | 2,129,329 | 1,665 |
| 7 Upton | 406,030 | 925 | 227,906 | 519 | 270,158 | 615 | 10,016 | 23 | 914,110 | 2,082 |
| UNIFIED DIST. SUB-TOTAL | $74,019,495 | $ 840 | $39,881,599 | $ 452 | $54,925,439 | $ 623 | $3,127,117 | $ 35 | $171,953,644 | $1,951 |
| FREMONT | | | | | | | | | | |
| 1 Lander | $ 944,553 | $ 657 | $ 411,984 | $ 286 | $ 750,204 | $ 522 | $ 30,935 | $ 22 | $ 2,137,676 | $1,487 |
| 9 Jeffrey City | 244,729 | 687 | 72,208 | 203 | 180,912 | 508 | 52,062 | 146 | 549,910 | 1,545 |
| 14 Ethete | 98,291 | 278 | 118,968 | 336 | 493,606 | 1,394 | 395,914 | 1,118 | 1,106,779 | 3,126 |
| 21 Fort Washakie | 179,258 | 671 | 93,591 | 351 | 212,908 | 797 | 333,986 | 1,251 | 819,742 | 3,070 |
| 27 Hudson | 14,923 | 159 | 31,251 | 332 | 115,630 | 1,230 | — | | 161,804 | 1,721 |
| 38 Arapahoe | 36,880 | 156 | 102,820 | 434 | 543,972 | 2,295 | 227,378 | 959 | 911,050 | 3,844 |
| ELEMENTARY SUB-TOTAL | $ 1,518,634 | $ 553 | $ 830,822 | $ 303 | $ 2,297,232 | $ 837 | $1,040,275 | $ 379 | $ 5,686,961 | $2,071 |
| Lander Valley HS | 1,118,119 | 1,206 | 366,541 | 395 | 705,016 | 761 | 240,129 | 259 | 2,429,804 | 2,621 |
| GRAND TOTALS | $76,656,248 | $ 835 | $41,078,962 | $ 447 | $57,927,687 | $ 631 | $4,407,521 | $ 48 | $180,070,409 | $1,961 |

## ORDER DENYING REHEARING AND RESPONDING TO REQUESTS FOR CLARIFICATION

The court after examination and study of the petitions for rehearing concludes:

■ 1. The opinion and decision of the court was implicit in its language, particularly in fixing of a date for future compliance that it was prospective in operation and not intended to disturb present statutory provisions for financing of school operations, including bonded indebtedness.

2. Because of previous holdings of this court dating back to 1971 which clearly enunciated inequity in school financing, an opportunity for reform has been available. *Sweetwater County Planning Committee for Organization of School Districts v. Hinkle,* Wyo.1971, 491 P.2d 1234 and *Johnson v. Schrader,* Wyo.1973, 507 P.2d 814. The court's decision herein again finds unconstitutional the state's system of school financing in failing to provide equal protection in violation of § 34, Art. I, Wyoming Constitution, compatible with § I, Art. VII, Wyoming Constitution, requiring a "uniform system of public instruction." Undue delay in implementing the court's decision would only be doing a disservice to the educational needs of the state with respect to financing. However, upon reconsideration, it appears advisable that the time for compliance with the court's direction be extended for a further brief period.

3. Other than a consideration of and accommodation to possible bonding impediments that are conceived to exist along with an extension of time for compliance, which will not in anywise alter the thrust of the court's decision heretofore made, we find that all other questions raised by the petitions for rehearing have already been considered and resolved within the court's opinion.

It is therefore

ORDERED that the relief granted and direction of the court's opinion handed down on January 15, 1980, are prospective.

FURTHER ORDERED that the time in which to convert to constitutional compliance be, and is, extended to July 1, 1983.

FURTHER ORDERED that the school system of the state of Wyoming continue under existing statutes; and the validity and enforceability of past and future acts, bonded indebtedness and obligations incurred under applicable statutes, as long as they are in force and effect, are assured.

FURTHER ORDERED that the judgment of the district court, made and entered on the mandate, be consistent with this order.

FINALLY ORDERED that the petitions for rehearing be and are denied, except as otherwise in this order provided.