**Keiran W. O'BRIEN, Appellant (Defendant),**

v.

**STATE of Wyoming, Appellee (Plaintiff).**

**No. 85–112.**

Supreme Court of Wyoming.

Jan. 13, 1986.

Ernest F. Fuller, Jr. of Bormuth, Freeman & Fuller, Cody, and Michael K. Davis of Redle, Yonkee & Arney, Sheridan, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., John Renneisen, Sr. Asst. Atty. Gen., Marion Yoder, Asst. Atty. Gen., and Cheryl Solon, Legal Intern, for appellee.

Timothy J. Kirven and Felecia A. Rotellini, Legal Intern, of Kirven & Kirven, Buffalo, for amicus curiae Wyoming Outfitters Ass'n.

Before THOMAS, C.J., and ROONEY,* BROWN and CARDINE, JJ., and RAPER, J., Retired.

RAPER, Justice, Retired.

Keiran W. O'Brien (appellant) was convicted, and fined $100 by a justice of the peace for Park County, on January 18, 1984, of hunting in a federal wilderness

* This case was decided prior to the retirement of Justice Rooney on November 30, 1985.

area unaccompanied by a licensed professional guide or resident guide, in violation of W.S. 23-2-401(a) and (b).[1]  On appeal to the district court, Park County, Fifth Judicial District, sitting as an appellate court, the conviction was affirmed after the district judge had given the matter his close attention and thoughtful consideration as reflected in a comprehensively written opinion.  Appellant appeals from the order of affirmance.

The issues advanced by the appellant are:

## "I.

"Does Wyoming Statute Section 23-2-401(a), requiring nonresident big game hunters who hunt in federal wilderness areas to employ guides violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution?

## "II.

"Does Wyoming Statute Section 23-3-401(a) violate the Privileges and Immunities Clauses of the United States Constitutions [sic]?

## "III.

"Does Wyoming Statute Section 23-2-401(a) violate the Supremacy Clause of the United States Constitution because it conflicts with the purposes of the National Wilderness Preservation System Act and federal regulations thereunder?"

We will affirm the decision of the district court and appellant's conviction.

Appellant, at the time of his citation on September 28, 1983, was a 46-year-old Minnesota resident having in his possession a valid "Wyoming Non-Resident Elk and Fishing Privilege" license.  He and his brothers had set up two hunting camps in the Park County section of the Teton wilderness area of the Teton National Forest.  At the time of his citation at one of the campsites, and at the trial, appellant admitted he had been hunting elk in the federal wilderness area without a licensed guide.  He knew at that time that Wyoming law required him to have such a guide when hunting big game animals in a wilderness area.  Elk are big game animals.  W.S. 23-1-101(a)(i).

Appellant further admitted that he had hunted in the Wyoming wilderness from 1980 to 1983 intentionally without a guide because he felt the guide requirement was unconstitutional.  He was an experienced hunter, familiar with the wilderness area in which he was hunting having been there on a ten or eleven-day camping trip with a Wyoming resident friend living in that area.  In 1980 he had hunted for two weeks 20 to 30 miles from the area he was

---

1.  W.S. 23-2-401(a) and (b):

"(a) No nonresident shall hunt big or trophy game animals on any designated wilderness area, as defined by federal or state law, in this state unless accompanied by a licensed professional guide or a resident guide.  There shall be at least one (1) licensed professional guide or resident guide accompanying each two (2) nonresident hunters.  The commission may also specify other areas of the state, or specific big or trophy game species, for which a licensed professional or resident guide is required for nonresidents, for purposes of proper game management, protection of hunter welfare and safety, or better enforcement of game [and] fish laws.  The commission may allow licensed guides to accompany more than two (2) hunters but no more than six (6) hunters in specific areas.

"(b) Any resident possessing a valid resident big or trophy game animal license may apply for and receive a resident guide license.  The resident guide license shall be issued without charge or bond by the commission, any district supervisor or resident game warden upon receipt of an affidavit from the resident stating the names and addresses of the nonresident hunters to be guided, the game to be hunted, the area to be hunted, and that the resident has not received nor will accept directly or indirectly any compensation for his services as a guide.  A resident guide shall not guide more than two (2) nonresident hunters in any calendar year on any national forest, wilderness area, national game refuge, or national park, except as provided in section 23.-1-49(a) [§ 23-2-401(a) ], nor shall he accept any compensation or gratuity for his services.  The name and license number of the nonresident hunter shall be placed on the back of the resident guide license and stamped or signed by the issuer."

hunting when he was issued the citation. He also testified at the trial that to hire a guide would cost between $1,500 and $2,000 for a ten-day trip.

In *Schakel v. State*, Wyo., 513 P.2d 412 (1973), this Court declared unconstitutional the predecessor statute to the one under which appellant was convicted and which we now consider. Since that time the amended version of W.S. 23–54 (1957), now W.S. 23–2–401, supra note 1, has been in effect. These two developments cast a different light on the problem and lead to a different conclusion than *Schakel*. The state in *Schakel* pointed out that W.S. 23–54 (1957) had been repealed in its entirety and replaced, but this Court properly refused to then consider the new statute as applicable. In addition, the United States Supreme Court in *Baldwin v. Fish and Game Commission of Montana*, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978), has held that recreational hunting is not a fundamental right protected by the Privileges and Immunities Clause of the United States Constitution. We therefore write on a clean slate, though some principles of law enunciated in *Schakel* remain viable. It may appear that different views are now present. If so, such differences can be attributed to discoveries in the field of law unearthed by *Baldwin*, as well as the statutory amendment. The recent case of *Powell v. Daily*, Wyo., 712 P.2d 356 (1986), involves an entirely different question, i.e., the resident requirement for a professional guide, so we will do no more than distinguish it later in this opinion.

█ In considering a constitutional attack on a statute, basic principles must be kept in mind. There is a presumption of constitutionality, and the burden is on the attacker to show unconstitutionality beyond a reasonable doubt. *Bell v. State*, Wyo., 693 P.2d 769 (1985). Reasonable doubts as to constitutionality are resolved by upholding the statute, if possible. *Armijo v. State*, Wyo., 678 P.2d 864 (1984).

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution has a parallel in Art. 1, § 34 of the Wyoming Constitution.[2] This Court has held those respective provisions are equivalents. *Washakie County School District Number One v. Herschler*, Wyo., 606 P.2d 310, cert. denied 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980). Therefore, our holding on the equal protection question herein shall be under both the United States and Wyoming Constitutions.

## I

█ There are two tests designed to determine if statutory classifications meet equal protection requirements. The first is employed where the interest affected is an ordinary one and the second where a fundamental interest is at issue. When an ordinary interest is involved, then a court merely examines to determine if there is a rational relationship between a classification made by the statute or statutes being viewed and a legitimate legislative state objective. In other words, if the court perceives that the legislature had some arguable basis for choosing the end and the means, it will sustain the law. *Cheyenne Airport Board v. Rogers*, Wyo., 707 P.2d 717 (1985). When a fundamental interest is affected or if a classification is inherently suspect, then the classification must be subjected to close scrutiny to determine if it is necessary to achieve a compelling state interest. The latter test requires that the state establish that there is no less onerous alternative by which its objective may be achieved. *Washakie County School District Number One v. Herschler*, supra.

*Baldwin* settles the matter of whether the right to hunt is a fundamental right in

---

**2.** Amendment XIV, § 1, Amendments to the Constitution of the United States: "No State shall * * * deny to any person within its jurisdiction the equal protection of the laws." Article 1, § 34, Wyoming Constitution: "All laws of a general nature shall have a uniform operation."

relation to the Privileges and Immunities Clause[3] of the United States Constitution:

"Does the distinction made by Montana between residents and nonresidents in establishing access to elk hunting threaten a basic right in a way that offends the Privileges and Immunities Clause? * * * Elk hunting by nonresidents in Montana is a recreation and a sport. In itself—wholly apart from license fees—it is costly and obviously available only to the wealthy nonresident or to the one so taken with the sport that he sacrifices other values in order to indulge in it and to enjoy what it offers. It is not a means to the nonresident's livelihood. The mastery of the animal and the trophy are the ends that are sought; appellants are not totally excluded from these. The elk supply, which has been entrusted to the care of the State by the people of Montana, is finite and must be carefully tended in order to be preserved.

"Appellants' interest in sharing this limited resource on more equal terms with Montana residents simply does not fall within the purview of the Privileges and Immunities Clause. Equality in access to Montana elk is not basic to the maintenance or well-being of the Union. Appellants do not—and cannot—contend that they are deprived of a means of a livelihood by the system or of access to any part of the State to which they may seek to travel. We do not decide the full range of activities that are sufficiently basic to the livelihood of the Nation that the States may not interfere with a nonresident's participation therein without similarly interfering with a resident's participation. Whatever rights or activities may be 'fundamental' under the Privileges and Immunities Clause, we are persuaded, and hold, that elk hunting by nonresidents in Montana is not one of them." 98 S.Ct. at 1862–1863.

We consider all of the observations of the Supreme Court of the United States applicable in Wyoming, as well.

■ Since elk hunting is a sport and not a fundamental right, we then need only apply the less rigorous test applied to an ordinary right, and we need only examine to determine if there is a rational relationship between the classification made by the statute or statutes being viewed and a legitimate state objective. The statutory classification we are here viewing is that nonresidents, in addition to having a Wyoming nonresident hunting license, must, when hunting big and/or trophy game animals[4] on any designated wilderness area in Wyoming as defined by federal law, be accompanied by a licensed professional or resident guide. W.S. 23–2–401, supra note 1. No such requirement is placed on resident hunters. The question is then whether there is a rational relationship between that classification between nonresidents and residents and a legitimate legislative state objective.

By W.S. 23–1–103, all wildlife[5] in Wyoming is declared to be the property of the state, and the purpose of the act (W.S. 23–1–101 through 23–6–207 as amended from time to time) and the policy of the state are to provide an adequate and flexible system for the control, propagation, management and regulation of all Wyoming wildlife.

The declaration of ownership and preemption by the state of the management and control of all wildlife in Wyoming has constitutional sanction. As said in *Lacoste v. Department of Conservation of State of Louisiana*, 263 U.S. 545, 44 S.Ct. 186, 68 L.Ed. 437 (1924), the wildlife within the

---

**3.** We observe an obvious interplay between the Equal Protection and the Privileges and Immunities Clauses. Some conditions to their application are the same. The involvement of a fundamental right is one of them.

**4.** W.S. 23–1–101(a)(i): "'Big game animal' means antelope, bighorn sheep, deer, elk, moose or mountain goat."

**5.** W.S. 23–1–101(a)(xiii): "'Wildlife' means all wild mammals, birds, fish, amphibians, reptiles, crustaceans and mollusks, and bison * * * within Wyoming."

borders of a state are owned by the state in its sovereign capacity for the common benefit of all its people. Because of such ownership and in the exercise of its police power, the state may regulate the taking and use thereof. *Baldwin* spoke approvingly of *Lacoste* in connection with police power in pointing out that the state has great latitude in determining what means are appropriate for the protection of wildlife. We hasten to agree with *Schakel,* however, that the enlightened concept of this ownership is one of a trustee with the power and duty to protect, preserve and nurture the wild game. *Baldwin* observes that though in most respects all those in a state must be treated equally, the state need not always share those things held in trust for its own people.

To carry out the state function of wildlife management, the Wyoming game and fish commission was legislatively created, W.S. 23–1–201, with extensive powers and duties, W.S. 23–1–302, including direction of the Wyoming game and fish department created by W.S. 23–1–401. A unique feature of game and fish management is that it is not financed by state appropriated funds, but primarily from hunting and fishing license fees and some federal grants. According to the 1984 Annual Report (Report) of the Wyoming game and fish department, an official publication required by W.S. 23–1–503,[6] the department had income of $23,393,488.53 of which $15,730,-839.30 was from licenses plus $540,750 from nonresident big game application fees. Report at 73. Its expenditures were $16,918,177.33. Report at 71. Wildlife management is a substantial state activity in terms of cost.

Enforcement of game and fish laws is a significant role the state must perform,

according to the chief game warden in 1984 when he said, "Law Enforcement is an on-going activity of the Division and is an important part of wildlife management." There were 2,642 arrests and fines amounting to $267,361 in 1983. Report at 12. There is some appropriated fund expense, in that connection, probably not measurable, except by some cost accounting method not to our knowledge undertaken, in that not only Wyoming game and fish department personnel are directed and authorized to arrest violators but also "every Wyoming law enforcement officer is authorized, empowered, and directed to arrest without a warrant, any person found violating any provision of" the game and fish act. W.S. 23–6–101.

As a part of the game and fish scheme of enforcement, guides play an important part. Every guide is required and "shall promptly report to the department or any game warden each violation of this act or order of the commission by any person guided." W.S. 23–2–403. One of the requirements and qualifications of the professional guide is that he have knowledge of the wilderness area, of hunting practices, of big game or guiding practices, and of game and fish laws. It is to be expected that nonresidents in many if not most cases would not have that knowledge and the familiarity to carry on the sport within the wilderness areas of Wyoming in a safe and law-abiding way. The hunter is protected and violations avoided through the guide requirement. It must be recalled that the legislatively stated purposes of requiring guides are "for purposes of proper game management, protection of hunter welfare and safety, or better enforcement of the game [and] fish laws." W.S. 23–2–401(a).[7] It expresses legislative intent.

---

6. We take judicial notice of official reports of state departments. *Washakie County School District Number One v. Herschler,* 606 P.2d at 322 n. 16. We selected the 1984 Annual Report for use because it covers the period July 1, 1983, to June 30, 1984, during which appellant was licensed and arrested.

7. This provision was not in W.S. 23–54 (1957), considered in Schakel. W.S. 23–54 (1957), in part:
   "A. * * * It shall be unlawful for any person who is not the owner of a resident license or permit lawfully authorizing the same to hunt, pursue or kill, or attempt to hunt, pursue or kill any elk, deer, bear, moose or mountain sheep on any land within any na-

We do not undertake to suggest that out-of-state hunters violate game laws to a greater extent than resident hunters. There is no empirical data available in Wyoming to sustain such a suggestion. The guide requirement is one of passive action to discourage violation of the law, unknowingly or knowingly. In Baldwin, it was observed that Montana has a law making guides responsible for reporting game law violations committed by persons in their hunting parties and that this in a sense makes a guide a surrogate warden and seems to bolster the state's warden force. We thus perceive a rationality and connection with the expressed state objective of better enforcement of the game and fish laws.

*Schakel*, in discussing safety, felt it significant that antelope were not included; that it was as unsafe to hunt antelope as elk. Antelope are now included as a big game animal. W.S. 23–1–101(a)(i), supra note 4. Schakel also noted that a wilderness area is by its definition clearly a more dangerous area to one not acquainted with the area.[8] W.S. 23–2–401(a) is now limited

to wilderness area. We notice that by W.S. 23–2–402(a)(v) a professional guide must take an examination which may include knowledge of hunting practices. This would include firearm handling and safety while hunting. So we find that hunter welfare and safety is a factor in requiring nonresidents to be accompanied by a guide and perceive it to be a rational legislative objective as stated in the statute.

While the appellant's statement of issues refers only to W.S. 23–2–401(a), we also see the noncompensated resident guide licenses as provided in W.S. 23–2–401(b), supra note 1, as a rational means of proper game management, protection of hunter welfare and safety, and better enforcement of game and fish laws. When the noncompensated resident guide obtains his license to guide a nonresident, he must furnish an affidavit stating the names and addresses of the nonresidents to be guided, the game to be hunted, and the area to be hunted. When the license is issued, the name and license number of the nonresident must be placed on the back of the resident guide

tional forest, national park or national game refuge within the boundaries of the State of Wyoming, any part of which is open to the hunting of deer, elk, moose or mountain sheep at any time during the calendar year in which said hunting is done, unless accompanied by a licensed guide; provided, however, that parties of two or more such persons hunting together need not be accompanied by more than one licensed guide for each two such persons.

"B. * * * No such licensed guide shall be required for not more than two non-residents hunting together when accompanied without compensation or gratuity by a resident of the State of Wyoming who is the owner of a resident big game license and a resident guiding permit. A resident guiding permit shall be issued, without charge and without bond, by the Cheyenne office or by any district supervisor or by any resident deputy game warden of the Wyoming game and fish commission to any resident of Wyoming owning a big game license in effect if and when such resident shall make and file an affidavit stating the names and addresses of not more than two non-resident hunters to be guided, the game to be hunted, the area in which they will hunt, and that such resident has not received nor will accept directly or indirectly any remuneration whatsoever. A resident

guide shall not guide more than two non-residents in each calendar year regardless of the number of resident guiding permits issued to him in each calendar year."

8. 16 U.S.C.A. § 1131(c) (1985):

"A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primative and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value."

license and stamped or signed by the issuer. This makes sense because it furnishes intelligence to the Wyoming game and fish department of who and where the hunters are and what they are hunting. This is an aid to the game warden assigned to that area in patrolling his territory and anticipating hunting pressure in the vicinity. In the event of a reported or suspected violation, it furnishes immediately, locally available investigative sources even after the hunter has left the state. In the event of lost hunters or dangerous high country storms, it permits a better check on the safety of hunters or rescue efforts if that should be required. We discern that keeping track of hunters is an important aspect of game management, hunter welfare and safety, and enforcement. There are undoubtedly difficulties of supervision of hunting in the wilderness area where every attempt is made to keep the surrounding and large expanses of land and timber in a primitive state.

Perhaps there are some nonresident hunters who are fully capable of looking out for themselves in particular areas and pose no problem to enforcement, but it is reasonable to conclude and more likely that they should have help. Baldwin points out that a statutory classification impinging upon no fundamental interest need not be drawn so as to fit with precision the legitimate purposes animating it. That a statute might have furthered its underlying purpose more artfully, more directly, or more completely does not warrant a conclusion that the method it chose is unconstitutional.

Appellant has not carried his burden of establishing irrationality of one of the means chosen by the state to carry on the business of game management for its citizens and citizens of other states within its boundaries. We hold W.S. 23–2–401 constitutional in not violating the equal protection provisions of the federal and state constitutions.

## II

■ Article IV, § 2, United States Constitution, provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." Section 1 of the Fourteenth Amendment of the Constitution is somewhat repetitive of that declaration of right and states that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; * * * nor deny to any person within its jurisdiction the equal protection of the laws." We need not concern ourselves with any fine distinctions that may exist between the language of Art. IV, § 2 and that in the Fourteenth Amendment with respect to privileges and immunities. We are here dealing with the privileges and immunities of citizens of the state of Wyoming to the extent they may apply to the citizen of another state—Minnesota—temporarily in the state of Wyoming to engage in the recreational sport of big game hunting for elk in a wilderness area. Under such circumstances we must examine Art. IV, § 2 and decide under those facts and circumstances whether the questioned activity of the state is prohibited. There is no comparable or parallel provision in the Wyoming Constitution except that "[t]he State of Wyoming is an inseparable part of the federal union, and the constitution of the United States is the supreme law of the land." Article 1, § 37, Wyoming Constitution.

Appellant, as a resident of Minnesota, claims that W.S. 23–2–401(a), supra note 1, violates the Privileges and Immunities Clause of the United States Constitution in that appellant, as a nonresident, has been afforded access to a federal wilderness area on a different basis than residents of the state of Wyoming. Appellant, however, agrees that the National Wilderness Preservation System does not interfere with the jurisdiction of states over wildlife and fish.[9]

9. 16 U.S.C.A. § 1133(d)(7) (1985):

"Nothing in this chapter shall be construed as affecting the jurisdiction or responsibilities of

*Baldwin* summarizes some situations in which state citizenship or residency can be used to distinguish among persons:

" * * * Suffrage, for example, always has been understood to be tied to an individual's identification with a particular State. [Citation.] No one would suggest that the Privileges and Immunities Clause requires a State to open its polls to a person who declines to assert that the State is the only one where he claims a right to vote. The same is true as to qualification for an elective office of the State. [Citations.] Nor must a State always apply all its laws or all its services equally to anyone, resident or nonresident, who may request it so to do. [Citations.] Some distinctions between residents and nonresidents merely reflect the fact that this is a Nation composed of individual States, and are permitted; other distinctions are prohibited because they hinder the formation, the purpose, or the development of a single Union of those States. Only with respect to those 'privileges' and 'immunities' bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally. Here we must decide into which category falls a distinction with respect to access to recreational big-game hunting." Baldwin, 98 S.Ct. at 1860.

We have in Part I of this opinion placed weight on the ownership in trust of the state's wildlife. However, that position must yield when without reason it interferes with a nonresident's right to pursue a livelihood in a state other than his own. That right is protected by the Privileges and Immunities Clause. Such a case is *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948), upon which appellant relies. In that instance the Court struck down a South Carolina statute requiring nonresidents of South Carolina to pay a license fee of $2,500 for each commercial shrimp boat and residents to pay a fee of only $25 on the ground that it violated the Privileges and Immunities Clause. Other burdens were also placed on nonresidents such as requiring proof before issuance of an annual license that they had paid South Carolina income taxes on profits from operations the preceding year and requiring boats licensed to travel for shrimp in the state's waters to dock at a South Carolina port and unload, park and stamp their catch before transporting to another state or waters thereof. Violations entailed suspension of the violator's license. The Court held that commercial fishing like other common callings is within the purview of the Privileges and Immunities Clause. The key word is commercial which translates into livelihood and distinguishes it from recreational fishing and hunting.[10] When a statute interferes with the right to make a living (pursue a common calling) by a nonresident, then a fundamental right is involved, and we apply a different test than when the right to engage in recreation is involved.

The district judge relied on *State v. Antonich,* Wyo., 694 P.2d 60 (1985), and applied the test there set out when analyzing a privileges and immunities claim. First the court must ascertain whether a statute burdens a fundamental right or activity since only those privileges and immunities bearing upon the concept of interstate harmony fall within the scope and purpose of the clause. Second, the court must examine the reasons for the discriminatory treatment to determine their validity and their relation to the degree of discrimination imposed by the statute. The district court, then sitting as an appellate court, determined that in the light of *Baldwin* no fundamental right was involved in that hunting is a recreational sport and not a fundamental right. In such cases the Privileges and Immunities Clause did not come into play, and there was no constitutional viola-

the several States with respect to wildlife and fish in the national forests."

**10.** *Toomer v. Witsell* explains that the ownership theory is really but a fiction expressive in legal shorthand of the importance to its people that a state have power to preserve and regulate the exploitation of an important resource.

tion in that regard. We agree with the thorough analysis of the district judge.

A most recent case in this Court, *Powell v. Daily*, supra, where the issue was whether W.S. 23-2-402(a)(iii), requiring a professional guide, amongst the other statutory qualifications, to have been a resident of Wyoming for a period of one year, was prohibited by the Privileges and Immunities Clause. It was held that such a requirement restricts the right of an Idaho resident to pursue a means of livelihood, and pursuing a common calling, plying a trade and doing business in another state are fundamental rights protected by the Privileges and Immunities Clause. W.S. 23-2-402(a) does specifically refer to the professional guide as being "in the business of guiding." *Powell* is a nonresident livelihood case in a fundamental right category while the nonresident hunter who is in Wyoming seeking recreation and pursuing a sport does not possess such a protected right. There is no conflict between *Powell* and the case we now have at hand. *Powell* deals with statutes from the point of view of the professional guide with a livelihood at stake—a fundamental right. We here deal with the hunter who has no fundamental right at stake. Our holding must necessarily take a different, less serious slant, accordingly. Where fundamental rights are involved, the test is entirely different and more stringent. *Schakel* was not a livelihood case but a hunter case. The complexion of the *Schakel* case has been completely changed by *Baldwin* and statutory amendment. The references in *Powell* to the *Schakel* case are not applicable to the hunter case we have here.

### III

■ The Supremacy Clause of the Constitution of the United States is found in the second clause of Art. VI:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

The appellant claims that the requirement that he employ a guide to accompany him into a federal wilderness, in which he has a valid license to hunt, burdens his right of access guaranteed him by the National Wilderness Preservation System. His claim is broadened to a charge that the guide law is inconsistent with the objectives of the National Wilderness Preservation System in that there is a limitation to his access as a licensed hunter when he has no need for a guide. Appellant concludes that the federal legislation and regulations preempt the professional guide requirement of W.S. 23-2-401(a).

The argument is most difficult to follow in the face of a specific provision, 16 U.S.C.A. § 1133(c)(7), supra note 9, stating that nothing in the chapter is to be construed as affecting the jurisdiction or responsibilities of the several states with respect to wildlife and fish in the national forests. A further provision, 16 U.S.C.A. § 1133(d)(5) (1985) states that "[c]ommercial services may be performed within the wilderness areas designated by this chapter to the extent necessary for activities which are proper for realizing the recreational or other wilderness purposes of the areas." Professional guiding is a commercial service in that such guides are compensated for their work. We have held that the use of such guides is a rational requirement of the statute requiring nonresidents to be accompanied by a licensed guide when hunting big game. This is consistent with the responsibility of the state of Wyoming with respect to wildlife.

The supplemental applicable Code of Federal Regulations, 36 CFR 293.8, specifically authorizes commercial services "to the extent necessary for realizing the recreational or other wilderness purposes, which may include, but are not limited to, the public services generally offered by packers, outfitters, and guides."

From the clear language of the National Wilderness Preservation System and regulations, we can find neither prohibition nor inconsistency but in fact find specific authority. W.S. 23–2–401(a) does not violate the Supremacy Clause of the Constitution of the United States.

Affirmed.

CARDINE, Justice, dissenting.

I dissent.

I would hold that § 23–2–401, W.S.1977, violates the Equal Protection Clause of the Fourteenth Amendment and is unconstitutional. It has no rational relationship to the objectives it seeks to promote. This result is consistent with our holding in *Schakel v. State,* Wyo., 513 P.2d 412 (1973).

The majority opinion reaches a result different from Schakel (which held the predecessor of § 23–2–401—§ 23–54—unconstitutional) because of the amendment of the statute and because of the holding in *Baldwin v. Fish and Game Commission of Montana,* 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978). Baldwin merely makes clear that only a low level of constitutional scrutiny need be applied because hunting is not a fundamental right; Baldwin does not alter our scrutiny of this statute from that applied in Schakel. Schakel spoke of a "reasonable and appropriate" means, which is a low level of scrutiny. It is the same requirement applied in the majority opinion.

I cannot find that the statute under attack, § 23–2–401, is a rational means to accomplish legitimate state ends. The ends sought are set forth in § 23–2–401(a) as proper game management, protection of hunters, and better enforcement of the game and fish laws. All of these are legitimate ends. The problem is whether a statute, which classifies on the basis of residence and requires only nonresidents to be accompanied by a guide in wilderness areas, is a rational means to accomplish these ends.

I inquire first whether the statute is rationally related to the objective of enforcing the game laws. It is true that guides must know the game laws and report violations. It is also likely that nonresident hunters do not have the same knowledge and are less likely to hunt in a safe and law-abiding manner without guides. The question, however, is whether the classification, which does not require a resident to have a guide, is rationally related to the objective. The court's opinion states that it is not suggested "that out-of-state hunters violate game laws to any greater extent than resident hunters." If nonresidents are no more likely to violate game laws than residents, a statute which classifies by residency has no rational relationship to the objective of enforcing game laws.

The next inquiry is whether the statute is rationally related to the goal of promoting hunter safety. Unlike the statute attacked in *Schakel v. State,* supra, this amended statute requires that a nonresident have a guide when hunting any big game animal *in wilderness areas.*

I cannot reconcile Schakel with the majority opinion. Schakel attacked the statute in question, § 23–54, W.S.1957 quoted on pages 7–8 of the opinion, as having little if any relationship to promoting hunter safety. One reason for the attack was that nonresident antelope hunters were not required to have a guide. The statute in this case does not require nonresident small game hunters or fisherman to have a guide. It would seem that nonresident small game hunters and fishermen are as likely to lose their way in a wilderness area as are big game hunters. And, if the potential problem is the handling of firearms, there is nothing to suggest that nonresidents are any more likely to mishandle their firearms than are residents.

Schakel also held that § 23–54 had little to do with safety because it provided that a resident, without qualifications, could guide up to two nonresident hunters if he did so without compensation and after filing an affidavit with the Game and Fish Commission. A very similar provision is now

 

found in § 23–2–401(b), W.S.1977. Schakel stated that this provision was "impossible to reconcile with the theory of safety unless one indulges in the violent presumption that mere residence in this State makes a competent, knowing guide * * *." If an affidavit will suffice to qualify a guide, why cannot a nonresident supply the Game and Fish Commission with the same information as a resident and qualify? The reason he cannot can only be understood by indulging in "the violent presumption" referred to in Schakel.

Schakel also questioned the provision of § 23–54 which permitted the uncompensated resident guide to guide no more than two nonresidents in any calendar year. This same provision is found in § 23–2–401(b). There is no apparent reason why, after guiding two nonresidents, the uncom-

pensated guide becomes a threat to hunter safety and can guide no more. The provision suggests that the statute seeks objectives other than hunter safety.

Finally, in the absence of any evidence that nonresidents have a different effect on the game population than do residents, I fail to see how the statute rationally relates to the objective of proper game management.

I believe that even with the lowest level of scrutiny this statute should be held unconstitutional.